# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

No. 02-3316

MELISSA ROBINSON, formerly known as
MELISSA SCHROEDER,

*Plaintiff-Appellant*,

*v.*

WARREN A. SAPPINGTON, Judge, Sixth Judicial
Circuit, in official capacity and individually,
JOHN P. SHONKWILER, Chief Judge, Sixth Judicial
Circuit, Macon County Circuit Court, in official
capacity and not individually and COUNTY
OF MACON,

*Defendants-Appellees*.

_____

Appeal from the United States District Court
for the Central District of Illinois.
No. 99 C 2266—**David G. Bernthal**, *Magistrate Judge.*

_____

ARGUED MAY 23, 2003—DECIDED DECEMBER 9, 2003

_____

Before EASTERBROOK, RIPPLE and WILLIAMS, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Melissa Robinson brought this cause
of action for hostile work environment sexual harassment
and constructive discharge pursuant to Title VII of the Civil
Rights Act as amended, 42 U.S.C. § 2000e et seq. Her
complaint named her immediate supervisor, Judge Warren

A. Sappington, in his individual and official capacities; her purported employer, Macon County, Illinois; and the chief judge of the state judicial circuit in which Judge Sappington sat, Chief Judge John P. Shonkwiler, in his official capacity. The district court entered summary judgment in favor of the defendants. For the reasons set forth in the following opinion, we affirm in part and reverse in part the judgment of the district court, and we remand the case for further proceedings consistent with this opinion.

# I

# BACKGROUND

## A.  Facts[1]

### 1.

Ms. Robinson was hired as a judicial secretary to Judge Warren Sappington, a judge of the Sixth Judicial Circuit in Macon County, Illinois, on March 28, 1994. Ms. Robinson, with the other judicial secretaries, was later reclassified as a judicial clerk. That position entailed performing secretarial duties, as well as attending court with the judge to whom she was assigned, handling docket entries and setting dates for cases.

At the time that the legal secretaries became judicial clerks, Janice Shonkwiler, who had been a legal secretary to Judge John Greanias, was named as an "administrative

---

[1]  Because this case comes to us on summary judgment, we "construe all facts in the light most favorable to the non-moving party," here Ms. Robinson, "and draw all reasonable and justifiable inferences in favor of that party." *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491-92 (7th Cir. 2000).

assistant." R.262, Ex.14 at 87. Although Janice Shonkwiler, in her new capacity, did not supervise the judicial clerks' daily activities, they "were told that [they] report to her." *Id.* Janice Shonkwiler reported directly to Judge Greanias, presiding judge for Macon County Circuit Court. Judge John P. Shonkwiler[2] was the chief judge of the Sixth Judicial Circuit, the circuit that included Macon County; however, Judge Shonkwiler's chambers were not in Macon County.

**2.**

When Ms. Robinson began her employment with the Macon County Circuit Court, she enjoyed a good working relationship with Judge Sappington. However, beginning in July 1996, Judge Sappington began inquiring frequently about Ms. Robinson's personal life, specifically her relationship with her husband. When Ms. Robinson informed Judge Sappington that she was separating from her husband and seeking a divorce, Judge Sappington urged her not to become sexually promiscuous and offered to buy her a vibrator so that she would not "mess[] around." R.262, Ex.14 at 28. Ms. Robinson turned "very red" from embarrassment, informed Judge Sappington that she did not like to discuss such topics and left the room. *Id.* at 30-31.

Also beginning in July, Judge Sappington started telling Ms. Robinson on a daily basis that she was beautiful. Ms. Robinson estimates that Judge Sappington said this approximately 50 to 100 times between the months of July and November 1996. During the same time period, Judge Sappington referred to Ms. Robinson as a "blond Demi

---

[2] Judge Shonkwiler is a distant relative of Janice Shonkwiler's husband.

Moore" approximately twenty-five times and, on occasion, called her a golden goddess. *Id.* at 82.

In August 1996, for a period of several weeks, Judge Sappington shook Ms. Robinson's hand on a daily basis, both in the morning when they arrived and in the evening before he left. When Ms. Robinson asked Judge Sappington why he was doing this, Judge Sappington stated that he would no longer shake her hand because he realized that he was doing it for physical contact with her, which was inappropriate.

August 1996 marked two other incidents of note. On one occasion, Ms. Robinson was in the courtroom scheduling court dates with attorneys when Judge Sappington summoned Ms. Robinson to his office. He told her that he did not like the attorneys speaking to her. When Ms. Robinson asked why, Judge Sappington commented that she was "a very beautiful woman" and that "they're talking to you today . . . because of the fact that you wore a thin bra and that [your] nipples were showing." *Id.* at 33. Ms. Robinson, believing that she was dressed professionally and not perceiving any objectionable behavior on the part of the attorneys, was very embarrassed by Judge Sappington's comments. The incident nearly brought her to tears, and she rushed home to change her clothes.

On another occasion in August 1996, Judge Sappington called Ms. Robinson into his office and went into a tirade because he believed she was involved romantically with an attorney who frequently was in the courthouse.[3] When Ms. Robinson questioned Judge Sappington as to why he felt

---

[3] Apparently, one of the bases for Judge Sappington's belief was that Judge Sappington had observed that Ms. Robinson's car was parked next to the attorney's car after court hours on the previous Friday.

he had the right to inquire about the men she saw, Judge Sappington replied that he could not stand the thought of Ms. Robinson with any other man. He further elaborated that he had been drinking over the weekend and that he "was dealing with issues" concerning "his feelings" towards Ms. Robinson and his own mortality. *Id.* at 42. He also acknowledged that his feelings for Ms. Robinson were "inappropriate." *Id.* at 43-44. Ms. Robinson suggested to Judge Sappington that he get his feelings under control lest he endanger his relationship with his wife.

By September of 1996, it became a courthouse rumor that the relationship between Judge Sappington and Ms. Robinson was something more than professional. Judge Sappington told Ms. Robinson that he wanted to kiss her in front of the courthouse staff in response to the rumors. Ms. Robinson expressed disgust at the remark and, knowing that Judge Sappington purported to be a religious man, suggested that he should seek forgiveness for such a remark. *See id.* at 68-69. Judge Sappington laughed at her suggestion.

On September 9, 1996, Ms. Robinson was in the courtroom with Judge Sappington. During the proceedings, a woman had testified that "she had kind of moved around from guy to guy." *Id.* at 49. After Judge Sappington and Ms. Robinson returned to chambers, Ms. Robinson was placing files on Judge Sappington's desk when he grabbed her face. Ms. Robinson testified that "he brought my face up so that I made eye contact, and he told me that he wanted me to look into his eyes so that I fully understood what he was saying. . . . He told me if he ever found out I was shacking up with anybody, he would kill me." *Id.* at 49-50.

Less than two weeks later, Ms. Robinson had another troubling encounter with Judge Sappington. On September

18, 1996, an attorney approached Ms. Robinson and told her that another judge in the courthouse, Judge John Davis, was upset with instructions that she (Ms. Robinson) had given a litigant. Ms. Robinson related the conversation to Judge Sappington, and Judge Sappington "asked . . . if any sexual remarks had been made"; Ms. Robinson responded that they had not. *Id.* at 71. At that point, Judge Sappington told Ms. Robinson about a conversation that he had with Judge Davis a few weeks prior. According to Ms. Robinson, "Judge Davis asked him [Judge Sappington] if Judge Sappington wanted me to sit on his face . . . . And Judge Sappington said that he remarked, yes, he wanted me to sit on his face." *Id.* at 73. The day after he related the comment to Ms. Robinson, Judge Sappington brought up the comment again and asked if she had any questions about the comment. Ms. Robinson replied that she did not.

Near the end of September, the judicial clerk for Judge Scott Diamond became ill. During that time, Judge Diamond came to speak to Judge Sappington. Ms. Robinson testified that, "when he came up, I told him that I knew his clerk was gone, if he was getting behind and if he needed me in any way that I would help him." *Id.* at 78. A few days later, when Ms. Robinson went into Judge Sappington's office to inform him that she was going to Judge Diamond's office to pick up some paperwork,

> [Judge Sappington] took one of the files that I set on his desk, flung it over his desk, his coffee cup went flying across the room and into a metal cabinet. He started yelling at me, . . . telling me that he would not allow me to work for any other judge in that building ever, and he went storming out of the office.

*Id.* at 79. Ms. Robinson was "visibly upset" by Judge Sappington's outburst. *Id.*

During the months of August and September, Judge Sappington also closely monitored Ms. Robinson's actions and company. Judge Sappington would note where Ms. Robinson's car was parked and whom she was parked next to; he also would put money in her parking meter for her. When Ms. Robinson went to lunch with another coworker, but without Judge Sappington, Judge Sappington would watch her from his office window. Judge Sappington also kept track of Ms. Robinson's activities outside the courthouse. For instance, when Ms. Robinson spent the weekend at her mother's farm in September, Judge Sappington—a private pilot—flew over her mother's house several times.

Ms. Robinson shared some of these incidents with a coworker, Ruth Young. Ms. Robinson also communicated with Janice Shonkwiler that she (Ms. Robinson) "was having problems" with Judge Sappington; however, she did not do so "in a formal way." R.262, Ex.14 at 87. However, two incidents occurred in October 1996 that prompted Ms. Robinson to take formal steps to curb Judge Sappington's behavior.

### 3.

On October 3, 1996, Judge Sappington summoned Ms. Robinson and an assistant state's attorney to his courtroom. Judge Sappington asked the state's attorney to recount the facts of a grisly murder in which a woman was shot, dismembered and decapitated. After the state's attorney left the room, Ms. Robinson, who was "very tearful," asked Judge Sappington "why he did that to me because there was absolutely no purpose in [the attorney] coming over there. It wasn't as though he was signing a warrant or anything like that and needed any information." *Id.* at 86. Judge Sappington responded that Ms. Robinson

was "beautiful and naive, and . . . would face a fate like [the victim] faced." *Id.* Ms. Robinson did not know "how to interpret" Judge Sappington's actions, but was very frightened by the incident. *Id.* at 86-87.

After the incident of October 3, 1996, Ms. Robinson spoke to her family about Judge Sappington's behavior and what she should do. Early the following week, Ms. Robinson spoke formally with Janice Shonkwiler about her recent experiences with Judge Sappington. She specifically recounted the more sexually explicit of Judge Sappington's comments. Ms. Robinson told Janice Shonkwiler that Judge Sappington's behavior since July, culminating with the incident of October 3rd, had made her afraid. According to Ms. Robinson, Janice Shonkwiler did not advise her what to do, nor did she inform Ms. Robinson that she would investigate the complaints.

On October 11, 1996, a local attorney, the one with whom Judge Sappington had accused Ms. Robinson of being romantically involved, entered the courtroom during a hearing to speak with Ms. Robinson regarding scheduling. Ms. Robinson testified that such actions by attorneys were commonplace and that Judge Sappington had approved of this procedure in the past. The attorney, apparently realizing that there was a conflict with the initial date set for the proceeding, had returned to secure a later date. Ms. Robinson left the courtroom with him to explain that, at the later date, Judge Sappington would be on a different judicial rotation for cases. Immediately after Ms. Robinson left the courtroom, Judge Sappington became visibly upset and pounded his gavel so hard on the bench that a piece of the gavel flew off and hit a witness. He stormed out of the courtroom and "started yelling at [the attorney], telling him to get upstairs to his chambers." *Id.* at 94. Ms. Robinson felt

that Judge Sappington's tirade "was based on his feelings for [her], and he appeared very out of control." *Id.*

Janice Shonkwiler observed Ms. Robinson leaving the courtroom in tears. When Ms. Robinson explained to Shonkwiler what had occurred, Shonkwiler gave Ms. Robinson Judge Greanias' home phone number and told Ms. Robinson to contact Judge Greanias personally.

**4.**

Ms. Robinson called Judge Greanias at his home that afternoon. In her deposition, Ms. Robinson related the following information concerning that call:

> I believe he knew it was me the minute I said something, and he asked me if I wished to meet him someplace to talk face to face, and I told him I didn't believe I could. I was crying on the telephone. I was very emotional at that point. He asked me what happened.
>
> I had no knowledge that he'd already been advised, but further in the conversation I could tell that he gave some indications he had been. He asked what occurred. I told him. He made the remark to me that he had already discussed with Judge Sappington his behaviors previous, like the week before, which I was not aware of, and asked me what other occurrences had taken place.

*Id.* at 96. Again, she detailed Judge Sappington's behavior and comments. Judge Greanias responded that "it was obvious that [Ms. Robinson] was very distraught and concerned about [her] safety . . . and told [her] to take a week's administrative leave." *Id.* at 101. Judge Greanias indicated that he would be speaking to Judge Sappington the next business day; he told Ms. Robinson to contact him after

work that day so that he could update her on what had happened and how they would proceed.

Ms. Robinson called Judge Greanias on the specified day. He indicated that he had spoken to Judge Sappington. He also told Ms. Robinson that she should remain on leave for the next few days; when she returned to work, she would report to Judge Diamond.

### 5.

When Ms. Robinson returned, she worked for Judge Diamond for one week. Apparently, however, Judge Diamond's clerk complained about working for Judge Sappington and, after that initial week, Janice Shonkwiler informed Ms. Robinson that she would be transferred back to Judge Sappington. According to Ms. Robinson, she did not want to return to Judge Sappington, but was not offered any alternative; Ms. Robinson testified that "[i]f I wanted my job, I had to move." *Id.* at 107.

After Ms. Robinson returned to work for Judge Sappington, the relationship was "very cold" and "non-communicative." *Id.* at 109-10. Judge Sappington told Ms. Robinson "that he was very angry that [she] went to Judge Greanias without going to him." *Id.* at 109.

When Ms. Robinson had been back with Judge Sappington only a few weeks, Judge Greanias informed Ms. Robinson that he was going to transfer her to Judge Francis. The decision, Ms. Robinson was told, arose because of what Judge Greanias characterized as unfounded criticism of Judge Sappington by Judge Davis concerning how Judge Sappington ran his courtroom and managed Ms. Robinson. Judge Greanias communicated to Ms. Robinson "that he had

a judge to protect and the only way he could protect that judge and protect [Ms. Robinson] was for [Ms. Robinson] no longer to be in that building." *Id.* at 111. Judge Greanias further related to Ms. Robinson that neither Judge Francis, nor the other employees involved in the proposed move, were happy about the transfer. Judge Greanias told her that her first six months with Judge Francis probably would be "hell" but that things would settle down after that. *Id.* at 113.[4] During this conversation, Judge Greanias also indicated that it was in Ms. Robinson's "best interest to resign." *Id.* at 111. Ms. Robinson agreed to think about the proposal.

After her discussion with Judge Greanias, Judge Sappington continued to monitor Ms. Robinson's actions and continued to evidence interest in her, despite the anger he displayed during working hours. Specifically, one day in November, Ms. Robinson went to work on a Saturday to pick up some personal items; she did not inform anyone that she was going. Ms. Robinson explained that:

> I was only there a minute and the telephone began ringing. The only person who knew I was up there was Don,[5] and I didn't answer the phone. I let it kick over to the answering machine. And it was Judge Sappington asking me if I would like to meet him somewhere, have a drink or something.

*Id.* at 137-38.

---

[4] Ms. Robinson had her own confirmation of Judge Francis' feelings on the matter. When Judge Greanias informed Judge Francis of the proposed transfer, Judge Francis left Judge Greanias' office, slammed the door behind him and glared at Ms. Robinson as he left the area.

[5] Don Schroeder is Ms. Robinson's former husband.

Later in November, Ms. Robinson determined that, after enduring the difficulties in working for Judge Sappington, she did not want to endure "hell" for six months in Judge Francis' chambers. Consequently, effective November 1996, Ms. Robinson resigned.

## B.   District Court Proceedings

After exhausting her administrative remedies, Ms. Robinson filed a seven-count complaint against Judge Sappington, Judge Shonkwiler and Macon County. Counts I and II alleged claims against Judge Sappington in his official and individual capacities, respectively, for hostile environment sexual harassment in violation of Title VII. Counts III and IV alleged hostile environment and quid pro quo sexual harassment against Macon County.[6] In Counts V and VI, Ms. Robinson alleged hostile environment and quid pro quo sexual harassment against Judge Shonkwiler in his official capacity. Finally, in Count VII, Ms. Robinson alleged that Judge Sappington, as an agent of the State of Illinois, had denied her equal protection and due process in violation of 42 U.S.C. § 1983.

### 1.   The Court's Dismissal of Counts II and VII

Early in the litigation, the defendants filed two separate motions to dismiss. Judges Sappington and Shonkwiler filed

---

[6]   We recognize, as did the district court, that the Supreme Court has abandoned the distinction between quid pro quo and hostile environment sexual harassment. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 760-65 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *Wolf v. Northwest Indiana Symphony Soc'y*, 250 F.3d 1136, 1141 (7th Cir. 2001).

a motion to dismiss Counts I, II, V, VI and VII. With respect to Counts I and II, Judge Sappington argued that he was not Ms. Robinson's employer, and, therefore, he could not be individually liable for violations of Title VII. Furthermore, because he was an employee of the State of Illinois and Ms. Robinson was an employee of Macon County, he could not be liable in his official capacity for Title VII violations either. With respect to the § 1983 claim, Judge Sappington argued that it was barred by the applicable statute of limitations. Judge Shonkwiler, for his part, argued that he could not be liable in his official capacity for the alleged Title VII violations because he was neither the employer of Judge Sappington nor the employer of Ms. Robinson.

The district court granted in part and denied in part the judges' motions. The district court determined that Judge Sappington could not be held liable under Title VII in his individual capacity. Additionally, the court determined that Ms. Robinson's § 1983 claim was barred by the applicable statute of limitations. However, the court held that Ms. Robinson's complaint stated a claim for hostile work environment and quid pro quo harassment for which Judges Sappington and Shonkwiler could be held liable in their official capacities. Consequently, the court denied the motion with respect to Counts II, V and VI. Ms. Robinson has not appealed the district court's dismissal order.[7]

---

[7] Ms. Robinson's notice of appeal indicates an intent to appeal only the district court's disposition of the summary judgment motions. We note that page three of Ms. Robinson's initial brief before this court references Count VII of her complaint as pending at the time that summary judgment was entered. *See* Appellant's Br. at 3. However, since Ms. Robinson's brief fails to

(continued...)

## 2. The County's First Motion for Summary Judgment

Shortly after the district court denied the judges' motion to dismiss, Macon County also filed a motion to dismiss. In that motion, the County argued that the court should enter judgment in its favor because, as a matter of law, it employed neither Ms. Robinson nor Judge Sappington. Consequently, because Title VII was directed only at employer's actions, it should not be a party to the litigation. The court denied Macon County's motion and held that there were genuine issues of material fact concerning whether Macon County or the State should be considered Ms. Robinson's employer.

## 3. The Court Enters Summary Judgment for the Defendants

After the close of discovery, all of the defendants moved for summary judgment on the remainder of the counts. Among the arguments forwarded by the defendants were that, in accordance with the Supreme Court's decisions in *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), they had taken reasonable steps to prevent sexual harassment from occurring, they had taken prompt remedial action in response to Ms. Robinson's complaints, and Ms. Robinson had not suffered a tangible employment action. Ms. Robinson believed that these arguments amounted to a belated attempt to assert an affirmative defense that should have been pleaded in the defendants' answers.

---

[7] (...continued)
address the issue of the dismissal of the § 1983 claim, we believe that this was merely a scrivener's error, and we address the Title VII claims that remained at summary judgment.

Judge Shonkwiler then filed a motion for leave to file the affirmative defenses that had been set forth in the motion for summary judgment. Prior to ruling on the defendants' motions for summary judgment, the district court, by minute entry, granted Judge Shonkwiler's motion to amend the answer to include the affirmative defenses briefed with the motion for summary judgment. *See* Minute Entry of 5/21/02.

The district court later granted the defendants' motions for summary judgment. *See* R.223 at 1. The court first noted that

> it allowed Defendant Shonkwiler to amend the answer that Defendants Shonkwiler and Sappington originally filed. The amendment included reference to the *Ellerth/Faragher* affirmative defense. Because the State is the employer of both Shonkwiler and Sappington, this affirmative defense applies to all claims brought against the State.

*Id.* at 11. The district court then turned to the merits of Ms. Robinson's claims.

Addressing first the constructive discharge claim, the district court recited the standard that "[t]o establish constructive discharge, an employee must show that she was forced to resign because her working conditions became unbearable from the standpoint of a reasonable employee." *Id.* However, the court continued, at the time that Ms. Robinson resigned her position, her working conditions were not unbearable. The court explained that, based on Ms. Robinson's own testimony, "the conduct (by Sappington) that she had found offensive had ceased" prior to her resignation. *Id.* at 12. Furthermore, continued the court,

> [t]he evidence shows that quitting was not the only option available to the Plaintiff: Judge Greanias offered to transfer her to another judge. That offer changed the calculus facing Plaintiff; quite simply, a reasonable person in her position would not have been compelled to resign her employment altogether. Plaintiff was entitled to reject the transfer, but because it revealed that her hands were not tied, and that resignation was not the only choice available to her, it shows that she was not constructively discharged.

*Id.* at 12-13. The court therefore concluded that Ms. Robinson's resignation did not constitute a constructive discharge.

The court then turned to the issue of whether Ms. Robinson had come forth with sufficient evidence to show that she had been subjected to a hostile work environment and whether the State could be liable for Judge Sappington's allegedly sexually harassing conduct. The court found Ms. Robinson had come forward with evidence that the conduct occurred because of Ms. Robinson's sex, that the actions constituted harassment and that the conduct created a work environment that was subjectively hostile to Ms. Robinson. However, the court determined that the incidents recounted by Ms. Robinson did not represent an objectively hostile work environment:

> In context, it is clear that although Sappington's comments and controlling behavior were undoubtedly inappropriate and sometimes offensive, they did not rise to the level of being pervasive or severe. Sappington did not proposition Plaintiff and he did not initiate uninvited physical contact of a sexual nature. He never made advances toward her. He did not attempt to kiss her or touch her in a sexual way. . . . Sappington's conduct was not threatening. Nor can it be said that the

> workplace was permeated with "discriminatory intimidation, ridicule, and insult." . . . Thus the Court concludes that the sum total of the evidence . . ., however offensive one might consider it, falls short of creating the kind of "hellish" environment that the Seventh Circuit has established as a standard for liability under Title VII.

*Id.* at 20 (internal citations omitted).

Because the court concluded that Ms. Robinson had not suffered a hostile work environment, it acknowledged that it did not have to address any other issues raised by the summary judgment motion or response. Nonetheless, the court went on to consider whether, assuming Ms. Robinson had established a prima facie case, the State of Illinois could be held liable for the alleged harassment.

Quoting the Supreme Court's decision in *Faragher*, 524 U.S. at 807-08, the court stated that the employer may be subject to vicarious liability to an employee for a hostile work environment created by a supervisor with immediate authority over the employee. *See id.* at 21. However, when no tangible employment action had been taken, " 'a defending employer may raise an affirmative defense to liability or damages . . . .' " *Id.* (quoting *Faragher*, 524 U.S. at 808). Looking to the question of whether there had been a tangible employment action, the court noted that the Seventh Circuit had not ruled on the issue of whether constructive discharge could be a "tangible employment" action for purposes of *Ellerth/Faragher*. However, it found persuasive the Second Circuit's reasoning in *Caridad v. Metro-North Commuter Railroad*, 191 F.3d 283 (2d Cir. 1999), in which the Second Circuit held that constructive discharge could not constitute a tangible employment action. Consequently, Ms. Robinson's alleged constructive discharge could not subject the State to strict liability under Title VII.

Given its conclusion that the harassment had not resulted in a tangible employment action, the court turned to the Judges' affirmative defense that there had been reasonable steps taken both to prevent and to correct promptly any harassing behavior. With respect to prevention, the court acknowledged that the Macon County Circuit Court had not posted nor promulgated a sexual harassment policy to its employees. However, the court determined that this consideration was not dispositive.

> The evidence shows that Plaintiff was aware of the procedure to follow in the event of problems. Therefore, although the State might have done better at posting the policy and informing employees about it even though they were in a temporary facility, in light of the circumstances in this case, the Court concludes that the undisputed facts show that Plaintiff knew how to obtain assistance—and sought that assistance—when she began experiencing problems.

*Id.* at 24. Furthermore, with respect to the employer's efforts to correct promptly any harassing environment, the court stated that "if the employer's response effectively ends the sexually harassing conduct, the response must be considered reasonable." *Id.* at 25. Therefore, because Judge Sappington's offensive conduct ceased upon Ms. Robinson's return to work for him, the response to the alleged harassment was reasonable. Consequently, summary judgment on behalf of Judge Sappington in his official capacity (as an agent of the State of Illinois) on Count I was appropriate.

The court reached the same conclusion with respect to Counts V and VI against Judge Shonkwiler. "Both claims," explained the court, "are brought against Shonkwiler in his official capacity, therefore, they both are, in essence, claims against the State." *Id.* at 27. Therefore, the reasons why the

State was not liable with respect to Judge Sappington applied with equal force to the claims against Judge Shonkwiler.

Finally, with respect to the claims against Macon County, the court held that it need not resolve the issue whether Macon County was a joint employer with the State of Illinois because it had determined that the conduct at issue did not create an actionable hostile environment.

> Moreover, even assuming that Defendant Sappington's conduct created a hostile environment, the State successfully established that it could not be held liable because it effectively stopped the harassing behavior. The fact that the remedy was set in motion by Judge Greanias, an agent of the State of Illinois, does not mean that Macon County would be liable even if it was determined to be Plaintiff's sole employer. For the same reasons that the State cannot be held liable, Macon County cannot be held liable.

*Id.* at 28. Therefore, summary judgment in favor of all the defendants was appropriate.

Ms. Robinson timely appealed.


## II

## DISCUSSION

Ms. Robinson maintains that the district court erred when it entered summary judgment in favor of the defendants. Specifically, Ms. Robinson argues that the facts, when construed in her favor, establish a prima facie case of hostile work environment sexual harassment. Additionally, she contends that the district court erred in allowing the defendants to amend their pleadings at the summary

judgment stage to include additional affirmative defenses. We review a district court's grant of summary judgment de novo, construing all facts in a light most favorable to the nonmoving party, *see Turner v. J.V.D.B. & Assocs., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003), and "[w]e review the district court's grant of a motion to amend for abuse of discretion," *E. Natural Gas Corp. v. Aluminum Co. of America*, 126 F.3d 996, 999 (7th Cir. 1997). We turn first to the question whether the district court erred in its determination that Ms. Robinson had not established a prima facie case of sexual harassment due to a hostile work environment.

### A. Hostile Work Environment

Title VII forbids an employer,

> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . .

42 U.S.C. § 2000e-2(a)(1). Ms. Robinson may establish a violation of Title VII by proving that she was subjected to a hostile work environment. To establish a prima facie case of hostile environment sexual harassment, a plaintiff must demonstrate that: (1) she was subjected to unwelcome sexual harassment; (2) the harassment was based on sex; (3) "the sexual harassment had the effect of unreasonably interfering with the plaintiff's work performance in creating an intimidating, hostile or offensive working environment that affected seriously the psychological well-being of the plaintiff;" and (4) there is a basis for employer liability. *Parkins v. Civil Constructors of Illinois, Inc.*, 163 F.3d 1027, 1032 (7th Cir. 1998); *see also Hall v. Bodine Elec. Co.*, 276 F.3d 345, 355 (7th Cir. 2002). The third prong of the prima facie

case requires both a subjective and objective inquiry, compelling the court to ask whether a reasonable person would find the environment hostile. *See Haugerud v. Amery Sch. Dist.*, 259 F.3d 678, 693 (7th Cir. 2001).

In this case, the district court found that there was unwelcome sexual harassment, that the harassment occurred on account of Ms. Robinson's sex, and that the harassment created a subjectively hostile work environment.[8] However, the court concluded that there was not sufficient support in the record that would permit a jury to find an objectively hostile environment. We respectfully disagree.

"In order to survive summary judgment on a hostile work environment claim, a plaintiff must present evidence that would establish that the allegedly hostile conduct was so severe or pervasive as to create an abusive working environment in violation of Title VII." *Russell v. Bd. of Trs. of the Univ. of Illinois at Chicago*, 243 F.3d 336, 342-43 (7th Cir. 2001); *Smith v. Sheahan*, 189 F.3d 529, 533 (7th Cir. 1999) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)). The resolution of this fact-intensive inquiry "is not, and by its nature cannot be, a mathematically precise test."

---

[8]  The district court also noted that there was a basis for imputing liability to the State of Illinois because "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." R.223 at 21 (citing *Hill v. Am. Gen. Fin., Inc.*, 218 F.3d 639, 642 (7th Cir. 2000)). However, the district court went on to determine that the State had established an affirmative defense to the harassment because it had not resulted in a tangible employment action and because it had taken reasonable steps to prevent and to correct the offending conduct. *See id.* at 21-26. We shall discuss the availability of affirmative defenses *infra* at II.B.

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993); *Hutchison v. Amateur Elec. Supply, Inc.*, 42 F.3d 1037, 1043 (7th Cir. 1994). We must consider "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance*." Harris*, 510 U.S.at 23; *see also Haugerud*, 259 F.3d at 693; *Russell*, 243 F.3d at 343.

We have observed that drawing the line between actionable and nonactionable sexual harassment "is not always easy." *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995).

> On one side lie sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; pornographic pictures. On the other side lies the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers. . . . It is not a bright line, obviously, this line between a merely unpleasant working environment on the one hand and a hostile or deeply repugnant one on the other . . . .

*Id.* at 430-31.

Moreover, the specific circumstances of the working environment and the relationship between the harassing party and the harassed can bear on whether that line is crossed. *See Smith v. Northwest Fin. Acceptance, Inc.*, 129 F.3d 1408, 1414 (10th Cir. 1997) (noting that the examination of relevant circumstances includes the setting and context in which the discriminatory behavior occurred). For instance, in *Quantock v. Shared Marketing Services, Inc.*, 312 F.3d 899 (7th Cir. 2002), we reversed a district court's grant of sum-

mary judgment in the defendant's favor, noting the importance of the defendant's "significant position of authority" and the close working quarters. *Id.* at 904; *see also Northwest Fin.*, 129 F.3d at 1414 (commenting that the "intimate office setting" of plaintiff's small office, which contained no partitions or walls, increased her humiliation and therefore the severity of the discriminatory conduct).

With this background in mind, we evaluate Judge Sappington's harassment of Ms. Robinson. First, we note that there were several overtly sexual comments made by Judge Sappington to Ms. Robinson including Judge Sappington's offer to purchase Ms. Robinson a sexual device, *see* R.262, Ex.14 at 28-31; Judge Sappington's comment that the attorneys were only speaking to her because she was wearing revealing clothing, *see id.* at 31-34; and the twice-repeated comment that Judge Sappington would like Ms. Robinson to "sit on his face," *see id.* at 70-77. In addition to these comments, there is strong evidence that Judge Sappington took an inappropriate interest in Ms. Robinson's relationships with men, first inquiring as to the status of her marriage and later, on two occasions, expressing outrage at the possibility of her romantic involvement with anyone else.

Second, we believe that much of Judge Sappington's conduct reasonably could be construed as intimidating and threatening. Judge Sappington monitored Ms. Robinson's actions both within the courthouse and after hours, going so far as to fly an aircraft over the farm of Ms. Robinson's mother when he knew Ms. Robinson was visiting there. Judge Sappington exhibited anger when he believed other men showed interest in Ms. Robinson. He also subjected Ms. Robinson to hearing the details of a gruesome murder and suggested that she might face a similar fate. Finally, on one occasion, Judge Sappington grabbed Ms. Robinson's face

and told her point-blank that, if she "shacked up" with anyone else, he would kill her.

Finally, Ms. Robinson was the recipient of other gestures that, although innocuous in themselves, when put in the larger context, served as constant reminders of Judge Sappington's interest in her and in exercising control over her. Specifically, Judge Sappington called her beautiful, a "blonde Demi Moore" or a golden goddess on a daily basis. He took her to lunch and became angry if Ms. Robinson did not eat lunch with him. Additionally, for a period of several weeks, he shook Ms. Robinson's hand on a daily basis to experience physical contact with her.

Viewing the evidence in the light most favorable to Ms. Robinson, we believe that a jury could conclude that Judge Sappington's conduct towards Ms. Robinson was objectively hostile. Sexually suggestive and intimidating incidents occurred on almost a weekly basis from the end of July until the middle of October. This was combined with daily evidence that Judge Sappington had a more-than-professional interest in Ms. Robinson and closely observed everything she did. As well, several actions and remarks of Judge Sappington were threatening, either overtly or in a more suggestive manner.

Furthermore, these actions must be placed in the context of the close working relationship that Judge Sappington, indeed any judge, has with the staff in his or her chambers. Ms. Robinson worked exclusively for Judge Sappington and, in the course of her duties, had little contact with other courthouse personnel. She regularly was required to be in Judge Sappington's office or his courtroom for the purpose of carrying out her duties. She could not avoid frequent personal contact with Judge Sappington and still do her job.

We believe that, arising within the context of a close working situation, a reasonable person would conclude that these actions were hostile and intimidating and that these actions would interfere with the work performance of a reasonable person. Consequently, we believe that the district court erred in holding that a reasonable jury could not conclude that this conduct created an objectively hostile work environment. We, therefore, turn to the question whether there is a basis for employer liability.

## B. Employer Liability

The Supreme Court in the companion cases of *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), spoke to the issue of when an employer may be liable for the sexual harassment of its employees. In *Ellerth*, the Court stated:

> An employer is subject to vicarious liability to a vic-timized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, see Fed. Rule Civ. Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. . . . No affirma-tive defense is available, however, when the supervi-sor's harassment culminates in a tangible employment

action, such as discharge, demotion, or undesirable reassignment.

524 U.S. at 765.

Judges Sappington and Shonkwiler maintain that, even if Ms. Robinson has established a prima facie case of hostile environment sexual harassment, they nevertheless are entitled to summary judgment because the harassment did not culminate in a tangible employment action and because reasonable steps were taken to prevent and correct the harassing behavior. Ms. Robinson counters that the defendants cannot rely upon the affirmative defense set forth in *Ellerth* because they did not plead that defense in a timely manner in the district court. She also maintains that, even if the defense was presented properly, the harassment by Judge Sappington resulted in two tangible employment actions: her transfer back to Judge Sappington after having worked for Judge Diamond for one week and her alleged constructive discharge. She further disputes that the defendants took reasonable preventative and corrective actions. We turn our attention first to the procedural issue raised by Ms. Robinson.[9]

---

[9]   Although the parties do not address the issue in detail, we note that there is at least a preliminary question of who, or what entity, is the proper defendant with respect to Ms. Robinson's Title VII action. It is only the employee's employer who may be held liable under Title VII. *See, e.g.*, *Williams v. Banning*, 72 F.3d 552, 553 (7th Cir. 1995) (holding that a supervisor, in his individual capacity, does not fall within Title VII's definition of employer). We explained in *Williams* that the term "employer" as used in Title VII is a statutory expression of traditional principles of respondeat superior liability. In the context of a sexual harassment claim, the employee's employer usually is that of the

(continued...)

## 1. Timeliness of the Affirmative Defenses

Ms. Robinson maintains that Judges Sappington and Shonkwiler may not rely on the affirmative defense set forth in *Ellerth* and *Faragher* because that defense was not raised in a timely fashion. Ms. Robinson points out that the defendants had several opportunities to amend their plead-

---

[9] (...continued)
harassing supervisor, and thus it is rational and consistent with standard agency principles to impute liability to the employer based on the actions of the supervisory employee.

In the present case, there is no question that Judges Sappington and Shonkwiler are employees of the State of Illinois. As such, any harassment inflicted by them on lower-level state employees under their direction can be imputed to the State of Illinois. Ms. Robinson, by naming Judges Sappington and Shonkwiler in their official capacities, has sought to hold liable the State of Illinois for the Judges' actions, and, indeed, the Attorney General of Illinois has appeared on behalf of the Judges throughout the litigation. *See Carver v. Sheriff of LaSalle County, Illinois*, 243 F.3d 379, 381 (7th Cir. 2001) ("*Carver I*") ("The §1983 suit was against him in his official capacity (which is to say, against the office . . .)." (citations omitted)).

Ms. Robinson also has named Macon County, Illinois, as a defendant in her Title VII action. It is her contention that Macon County is her joint employer with the State of Illinois. Ms. Robinson, however, does not contend that she is not also an employee of the State, *see* Appellant's Br. at 25 ("Melissa contends Macon County was a joint employer . . . ."); furthermore, neither Judge Sappington nor Judge Shonkwiler argue before this court that Ms. Robinson was, exclusively, the employee of Macon County. Therefore, because all parties acknowledge that the State of Illinois was, at the very least, Ms. Robinson's joint employer with the County, we consider the vicarious liability of the State of Illinois for the harassment of Judge Sappington. We consider the involvement of the County *infra* at II.C.

ings prior to filing a motion for summary judgment, but never did so. Quoting our decision in *Venters v. City of Delphi*, 123 F.3d 956, 967-68 (7th Cir. 1997), Ms. Robinson contends that " 'if Rule 8(c) is not to become a nullity, we must not countenance attempts to invoke such defenses at the eleventh hour, without excuse and without adequate notice to the Plaintiff.' " Appellant's Br. at 48-49. As noted above, "[w]e review the district court's grant of a motion to amend for abuse of discretion." *E. Natural Gas Corp.*, 126 F.3d at 999.

We recently addressed this assertion, with respect to a statute-of-limitations defense, in *Jackson v. Rockford Housing Authority*, 213 F.3d 389 (7th Cir. 2000). In that case we stated:

> Federal Rule of Civil Procedure 8(c) requires a defendant to plead a statute of limitations defense and any other affirmative defense in its answer to the complaint. *See* Fed. R. Civ. P. 8(c). On the other hand, the district court has the discretion to allow an answer to be amended to assert an affirmative defense not raised initially. *See* Fed. R. Civ. P. 15(a). Rule 15(a) states that "leave shall be freely given when justice so requires." *See id.* As a rule, we have allowed defendants to amend when the plaintiff had adequate notice that a statute of limitations defense was available, and had an adequate opportunity to respond to it despite the defendant's tardy assertion.

*Id.* at 392-93.

A review of the record reveals that the *Ellerth/Faragher* defenses were a focus of the defendants' inquiries during discovery. Counsel for the defendants explored in detail the circumstances surrounding Ms. Robinson's transfer and resignation during her deposition. Counsel also inquired

about Ms. Robinson's knowledge of complaint procedures, as well as the actions taken by the defendants in response to Ms. Robinson's complaints. The record, therefore, shows that Ms. Robinson and her counsel were aware that the defendants were seeking evidence in support of the *Ellerth/Faragher* defense. Furthermore, the defense was raised in the memoranda supporting the defendants' motion for summary judgment, and Ms. Robinson had an opportunity to respond to the defendants' arguments in favor of that defense in her opposition brief.[10] Finally, Ms. Robinson has not suggested that she was prejudiced in any way by the district court's action in allowing the defendants to assert the defense. Consequently, because Ms. Robinson had notice that the defendants might pursue these defenses, had the opportunity to respond to the assertion of these defenses and has not shown that she was prejudiced by the amendment, we do not believe that the district court abused its discretion in allowing the defendants to amend the pleadings at the time of their summary judgment motions.[11]

---

[10] Although Ms. Robinson does not concede this point, she does not contend otherwise in her briefs before this court.

[11] Ms. Robinson also contends that, because Judge Sappington did not seek leave to amend his Answer nor join in Judge Shonkwiler's Motion for Leave to Amend his Answer, the district court abused its discretion by invoking the defense on behalf of Judge Sappington as well as on behalf of Judge Shonkwiler. *See* Appellant's Br. at 49. Ms. Robinson relies upon *Macon v. Youngstown Sheet & Tube Co.*, 698 F.2d 858, 861 (7th Cir. 1983), in support of her argument. In that case, we considered whether the district court erred in granting a motion to dismiss in favor of both defendants when only one defendant had filed the motion. We stated:

(continued...)

## 2. Constructive Discharge

As noted above, Judges Sappington and Shonkwiler maintain that, even if Ms. Robinson has established a prima facie case of sexual harassment, they cannot be held strictly liable for the harassment because the harassment did not culminate in a tangible employment action. *See Ellerth*, 524 U.S. at 765 ("No affirmative defense is available . . . when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesir-

---

[11] (...continued)

> Here the claim raised by the Company in its motion to dismiss would be equally effective in barring the claim against the Union. The appellant had an adequate opportunity to argue in opposition to the motion to dismiss and to submit evidentiary material, and the appellant did so argue and did submit evidentiary material. Because the appellant did have an opportunity to submit evidentiary material in opposition to the Company's motion and because the district court, in its disposition of the Company's motion, must have determined that there were no issues of material fact and that the plaintiff's claim was barred for failure to exhaust the grievance and arbitration procedures of the collective bargaining agreement, there is no reason why the court could not, on its own motion, grant to the Union the same relief afforded the Company.

*Id.* at 861. Similarly, in the present case, the defenses raised by Judge Shonkwiler in his official capacity, apply with equal force with respect to Judge Sappington; indeed, even more so in the present case because the actions against both judges were "official capacity" actions implicating the same public authority—namely the State of Illinois. Accordingly, the district court's decision in the present case was consistent with our decision in *Macon*, and the district court did not abuse its discretion in considering the defense with respect to Judge Shonkwiler.

able reassignment."). Ms. Robinson counters that Judge Sappington's harassment culminated in her constructive discharge which constitutes a tangible employment action for purposes of Title VII. She also maintains that her transfer back to Judge Sappington, after spending a week working for Judge Diamond, satisfies this requirement. We turn first to the question of the constructive discharge.

### a. Tangible Employment Action

This court has not yet had to decide whether a constructive discharge is a tangible employment action within the meaning of *Ellerth/Faragher*. *See Wolf v. Northwest Indiana Symphony Soc'y*, 250 F.3d 1136, 1142 (7th Cir.), *cert. denied*, 534 U.S. 1028 (2001); *Mosher v. Dollar Tree Stores, Inc.*, 240 F.3d 662, 666-67 (7th Cir.), *cert. denied*, 534 U.S. 1041 (2001). The approaches of the circuits that have confronted the issue have varied somewhat in rationale. A brief look at those attempts to deal with the issue will assist us in determining the precise question before us today. The Third Circuit, in *Suders v. Easton*, 325 F.3d 432 (3d Cir. 2003), *petition for cert. granted*, 72 U.S.L.W. 3105 (U.S. Dec. 1, 2003) (No. 03-95), determined that a constructive discharge should be considered a tangible employment action for purposes of the *Ellerth/Faragher* analysis. The Eighth Circuit also has followed this course, although it has not set forth its rationale in great detail. *See, e.g., Jackson v. Arkansas Dep't of Educ.*, 272 F.3d 1020, 1026 (8th Cir. 2001), *cert. denied*, 536 U.S. 908 (2002). Like the Third Circuit, the Second Circuit has faced the issue squarely, but has determined that a constructive discharge cannot be considered a tangible employment action for purposes of Title VII. *See Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283 (2d Cir. 1999). The First Circuit has trod a middle ground and held that "[b]ecause the conduct differs from case to case," there is "no reason to

adopt a blanket rule one way or the other." *Reed v. MBNA Mktg. Sys., Inc.*, 333 F.3d 27, 33 (1st Cir. 2003).

We believe that the analyses of the Second and First Circuits are instructive in resolving the case before us. In *Caridad*, the Second Circuit considered whether a constructive discharge resulting from the sexual harassment by a supervisor and coworkers could constitute "a tangible employment action" for purposes of the *Ellerth/Faragher* analysis. The Second Circuit concluded that it could not. *See id.* at 294. In reaching this conclusion, the Second Circuit noted that, in *Ellerth*, the Supreme Court relied heavily upon the Restatement (Second) of Agency. Specifically, the Second Circuit pointed to the following excerpt that also had been noted by the Court in *Ellerth*: " 'A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless: . . . (d) the servant . . . was aided in accomplishing the tort by the existence of the agency relation.' " *Caridad*, 191 F.3d at 294 (quoting Restatement (Second) of Agency § 219(2) (1957)). The Second Circuit further explained that

> [i]n searching for a principled limitation of the "aided by the agency relation" concept, the Supreme Court concluded that the requirement of a tangible employment action by the harassing supervisor would ensure that employer liability would be imposed without the possibility of an affirmative defense only where the employer is implicated in the harm visited upon the employee by his or her supervisor:
>
>> When a supervisor makes a tangible employment decision, there is assurance the injury could not have been inflicted absent the agency relation. . . . As a general proposition, only a supervisor, or other person acting with the authority of the company,

> can cause this sort of injury. A co-worker can break a co-worker's arm as easily as a supervisor, and anyone who has regular contact with an employee can inflict psychological injuries by his or her offensive conduct. But one co-worker . . . cannot dock another's pay, nor can one co-worker demote another. . . . The supervisor has been empowered by the company as a distinct class of agent to make economic decisions affecting other employees under his or her control.
>
> . . . A tangible employment decision requires an official act of the enterprise, a company act. . . . For these reasons, a tangible employment action taken by the supervisor becomes for Title VII purposes the act of the employer. . . .

Co-workers, as well as supervisors, can cause the constructive discharge of an employee. And, unlike demotion, discharge, or similar economic sanctions, an employee's constructive discharge is not ratified or approved by the employer.

*Caridad*, 191 F.3d at 294 (quoting *Ellerth*, 524 U.S. at 761-62 (internal citation omitted)). Thus, the Second Circuit concluded that, because a constructive discharge does not bear the same indicia of official action as other situations that have been considered tangible employment actions, it cannot be considered a tangible employment action for purposes of *Ellerth* and *Faragher*.

The same rationale animated the decision of the First Circuit in *Reed*. In that case, an employee had endured harassment at the hands of her supervisor and had resigned. The First Circuit determined that, in that case, the constructive discharge did not result in a tangible employment action. It explained:

> Nothing is gained by arguing in the abstract about whether a constructive discharge is or is not a discharge; for some purposes or rubrics, it might be so treated, and for others not. What matters is the Supreme Court's rationale for excluding tangible employment actions from the affirmative defense, namely, that a supervisor who takes official action against an employee should be treated as acting for the employer. There might indeed be cases in which official actions by the supervisor—e.g., an extremely dangerous job assignment to retaliate for spurned advances—could make employment intolerable, but nothing like that is present here.

*Reed*, 333 F.3d at 33 (citations omitted).

The common thread in *Caridad* and *Reed* is a concern that equating constructive discharge with other types of tangible employment actions will impose liability on employers when the offending employee has not been empowered by the employer to take the actions at issue. However, there can be, as noted by the Second Circuit, a striking difference between actions taken by coworkers and actions taken by supervisors; unlike a coworker, a "supervisor has been empowered by the company as a distinct class of agent to make economic decisions affecting other employees under his or her control." *Caridad*, 191 F.3d at 294 (internal citations omitted). Additionally, economic sanctions imposed by a supervisor typically are "ratified or approved by the employer." *Id.* For these reasons, we believe that it is appropriate to draw a distinction between a constructive discharge caused by co-employees and a constructive discharge caused by supervisors. Specifically, in circumstances where "*official* actions by the supervisor . . . make[s] employment intolerable," *Reed*, 333 F.3d at 33, we believe a

constructive discharge may be considered a tangible employment action. As demonstrated below, we believe this to be such a case.

### b.  Application

### i.

A constructive discharge occurs when an employee resigns his or her current position because the employee considers the conditions intolerable and a reasonable employee also would have found the conditions made remaining in the job unbearable. *See Lindale v. Tokheim Corp.*, 145 F.3d 953, 955 (7th Cir. 1998). We have stated that the "[w]orking conditions for constructive discharge must be even more egregious than the high standard for hostile work environment because 'in the "ordinary" case, an employee is expected to remain employed while seeking redress.' " *Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1050 (7th Cir. 2000) (quoting *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 886 (7th Cir. 1998)), *cert. denied*, 531 U.S. 1078 (2001); *see Mosher*, 240 F.3d at 667 ("Absent extraordinary conditions, 'a complaining employee is expected to remain on the job while seeking redress.' " (quoting *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1015 (7th Cir. 1997))); *Lindale*, 145 F.3d at 956 ("[T]he employee would have to show why he had to quit immediately, before he found the other job; why, in other words, his duty to mitigate damages did not require him to remain.").

The defendants maintain that, as a matter of law, Ms. Robinson's resignation cannot be considered a constructive discharge because, at the time of Ms. Robinson's discharge, the harassment by Judge Sappington had ceased and because Ms. Robinson had no reasonable basis for believing

that a transfer to Judge Francis' chambers would be un-bearable. We respectfully disagree.

With respect to the defendants' first contention—that Judge Sappington's harassment of Ms. Robinson had ceased prior to her resignation and therefore cannot support a constructive discharge—we believe that there are genuine issues of material fact that preclude summary judgment. Ms. Robinson testified in her deposition that, after she was transferred back involuntarily to work for Judge Sappington, he was cold, noncommunicative and very angry with her for reporting the alleged harassment to Judge Greanias without consulting him (Judge Sappington) first. As well, there is evidence in the record to support the inference that Judge Sappington had no intention of ceasing his harassment toward Ms. Robinson; he continued to monitor her actions and to exhibit romantic interest in her.

Furthermore, there is evidence that Judge Greanias be-lieved that the only way to protect Ms. Robinson from future harassment by Judge Sappington was to transfer her.[12] However, the manner in which Judge Greanias chose

---

[12] Again, we note that the evidence of Judge Greanias' need to "protect" Ms. Sappington arose within the context of Judge Greanias' response to Judge Davis' criticism of how Judge Sappington ran his courtroom and how he managed his staff, specifically Ms. Robinson. *See supra* I.A.5. According to Ms. Robinson's testimony, when Judge Greanias announced the decision to transfer her, he explained "that he had a judge to protect and the only way he could protect that judge and protect [Ms. Robinson] was for [Ms. Robinson] no longer to be in that building." R.262, Ex.14 at 111.

The defendants argue that this statement does not acknowledge a need to transfer Ms. Robinson to protect her from Judge
(continued...)

to protect Ms. Robinson was a transfer to Judge Francis. Ms. Robinson was further informed, by Judge Greanias, the presiding judge for Macon County Circuit Court, that both Judge Francis and his staff were upset about the proposed transfer and that Judge Francis would make her life "hell" for six months. Judge Francis confirmed this intention when he left Judge Greanias' chambers in a rage, slammed the door behind him and glared at Ms. Robinson on his way out. We believe, under these circumstances, Ms. Robinson was entitled to take Judge Greanias at his word and believe that her life in Judge Francis' chambers would be, at least for a period of months, unbearable. Indeed, Judge Greanias' suggestion to Ms. Robinson was that she resign.

Viewed in the light most favorable to Ms. Robinson, the evidence supports a conclusion that Judge Sappington's offending behaviors had not ceased at the time of Ms. Robinson's resignation and that the only alternative offered to Ms. Robinson would subject her to an equally cruel working situation. Consequently, we believe that the jury could conclude that Ms. Robinson suffered a constructive discharge.

**ii.**

---

[12] (...continued)
Sappington's advances. Instead, the defendants maintain that the only message this statement conveys is that Judge Greanias desired to protect both Judge Sappington and Ms. Robinson from additional, unfounded criticism by Judge Davis. The defendants' interpretation of this statement is not an unreasonable one. Nevertheless, we believe that a reasonable jury could give a different meaning to the statement—that the transfer was to protect Judge Sappington from Judge Davis' criticism and to protect Ms. Robinson from Judge Sappington's advances.

We additionally believe that, under the circumstances of this case, Ms. Robinson's constructive discharge may be considered a tangible employment action for purposes of the *Ellerth/Faragher* affirmative defense. This was not simply a situation in which a supervisor was inflicting harassment on a subordinate. In this case, Judge Greanias, in his capacity as presiding judge, took the official action of transferring Ms. Robinson to Judge Francis and made the suggestion that she resign. The transfer was only possible because Judge Greanias "ha[d] been empowered by the [employer] . . . to make economic decisions affecting other employees under his or her control." *Caridad*, 191 F.3d at 294 (internal quotation marks and citations omitted). Furthermore, the suggestion that Ms. Robinson resign was given added effect because Judge Greanias was speaking in his official, supervisory capacity when the suggestion was made. Consequently, because a jury could determine that Ms. Robinson's decision to resign resulted, at least in part, from Judge Greanias' official actions in transferring Ms. Robinson to Judge Francis and in suggesting that she resign, we believe that it would be appropriate to hold the State of Illinois liable for Ms. Robinson's resulting resignation.[13]

---

[13] Because we reverse the district court's determination that, as a matter of law, Ms. Robinson's alleged constructive discharge did not constitute a tangible employment action, we must remand that issue to the district court for further proceedings. We, therefore, do not reach the issue whether Ms. Robinson's transfer back to Judge Sappington, standing alone, also constituted a tangible employment action.

Furthermore, as noted above, if a supervisor's harassment culminates in a tangible employment action, the employer is strictly liable for the resulting damage to the employee under the
(continued...)

---

[13] (...continued)

*Ellerth/Faragher* analysis. It is only if a tangible employment action has not resulted that an employer may pursue the *Ellerth/Faragher* defense. Consequently, it is not necessary for us to determine whether the district court erred in determining that the defendants had taken reasonable steps to prevent and to correct the harassing behavior. Nevertheless, we note in passing that there are genuine issues of material fact regarding whether the defendants could mount a successful defense. In order to establish entitlement to the *Ellerth/Faragher* defense, an employer has the burden of proving: (1) that the "employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and (2) that the victimized employee "unreasonably failed to take advantage of any preventive or corrective opportunities . . . or to avoid harm otherwise." *Faragher*, 524 U.S. at 807. A jury certainly could conclude that the meager action of adopting, but not promulgating, a sexual harassment policy failed to inform employees of their right to be free from such behavior as well as of the steps the employees could take to remedy any offending behavior. The fact that Ms. Robinson understood that, if she had general workplace complaints, she should report those to Janice Shonkwiler does not absolve her employer of the responsibility to take reasonable steps to protect her from sexual harassment.

There is also evidence from which a jury could conclude that the response of Janice Shonkwiler, Judge Greanias and Judge Shonkwiler to Ms. Robinson's complaint was inadequate. Ms. Robinson reported the harassment to Janice Shonkwiler on a Monday; according to Ms. Robinson, no action was taken on that complaint. It was not until Friday of that week, after there had been another incident involving Judge Sappington, that Ms. Robinson was given Judge Greanias' home number to lodge another complaint.

(continued...)

### C. Macon County as a Necessary Party

Macon County maintains that, even if the district court erred in granting summary judgment to the defendants on the merits of Ms. Robinson's claims, it is nevertheless entitled to summary judgment because it is not Ms. Robinson's employer. Macon County urges that, given its lack of control over the parties involved in the underlying harassment, it cannot be considered Ms. Robinson's employer for purposes of Title VII. Ms. Robinson counters that, if the facts are interpreted in the light most favorable to her, the evidence suggests that Macon County is her joint employer with the State of Illinois and, consequently, can be held liable for the harassment she endured. She further contends that, even if Macon County is not her employer, principles of estoppel prevent it from so asserting. The district court initially determined that the issue of a joint employer relationship was a question of fact, which precluded summary judgment. After the comprehensive motions for summary judgment were filed, the court found it unnecessary to rule on the issue because it held that Ms. Robinson's substantive claims lacked merit.

---

[13] (...continued)

Finally, there does not seem to be any evidence in the record that Ms. Robinson failed to avail herself of the remedies known to her. She complained initially to Janice Shonkwiler; when provided with his number and when advised to do so, she complained to Judge Greanias. The record does not suggest that Ms. Robinson was informed of any further avenues of recourse or complaint. Consequently, there is evidence from which a jury could conclude that the *Ellerth/Faragher* defense is not available in the present case.

We agree with Ms. Robinson that the question of joint liability is one that is fact-bound and that necessarily is best addressed by the district court in the first instance. However, independent of the joint employer issue, we believe that Macon County is a necessary party to this action. In *Carver v. Sheriff of LaSalle County, Illinois*, 243 F.3d 379 (7th Cir. 2001) ("*Carver I*"), this court certified to the Supreme Court of Illinois the question of which state entity was responsible for paying "official-capacity judgments in Illinois when the wrongdoer is an independently-elected officer." *Id.* at 381. In that case, a sheriff had settled a Title VII action seeking damages against him in his official capacity. When the plaintiffs sought to collect the settlement from the county, the county argued that it was not responsible for the settlement amount. "We therefore respectfully ask[ed] the Supreme Court of Illinois to answer the question whether, and if so when, Illinois law requires counties to pay judgments entered against a sheriff's office in an official capacity." *Id.* at 386. The Supreme Court of Illinois determined that "[b]ecause the office of the sheriff is funded by the county, the county is therefore required to pay a judgment entered against a sheriff's office in an official capacity." *Carver v. Sheriff of La Salle County*, 787 N.E.2d 127, 141 (Ill. 2003) ("*Carver II*"). After receiving the reply from the Supreme Court of Illinois, this court made the additional observation that the Supreme Court of Illinois' answer to the question "implies an additional point of federal law: that a county in Illinois is a necessary party in any suit seeking damages from an independently elected county officer (sheriff, assessor, clerk of court, and so on) in an official capacity. *See* Fed. R. Civ. P. 17, 19." *Carver v. Sheriff of LaSalle County, Illinois*, 324 F.3d 947, 948 (7th Cir. 2003) ("*Carver III*").

We believe that the implied rule from the Supreme Court of Illinois' decision in *Carver II* applies with equal force in the present case. The responsibility for maintaining and funding the Macon County Circuit Court lies with Macon County. Under Illinois law, it is responsible for the payment of expenses and judgments emanating from the workings of that court. The fact that some of the parties involved are state officials, as opposed to employees of Macon County, does not alter that fiscal responsibility. *See Pucinski v. County of Cook*, 737 N.E.2d 225, 228 (Ill. 2000) (holding that, although "clerks of the circuit courts are nonjudicial officers of the judicial branch of state government and not employees of the counties, responsibility for maintaining the clerks' offices belongs to the counties" and therefore are subject to the requirements of the Counties Code (internal citations omitted)). Therefore, because Macon County has a financial interest in the outcome of this action, it is a necessary party.[14]

---

[14] Macon County insists that state principles of separation of powers prevent the counties from interfering with the operations of the judiciary and therefore prevent Macon County from being considered a joint employer with the State of Illinois with respect to judicial employees. We believe that there are three fundamental flaws with this argument. First, a State's principles of internal organization cannot frustrate federal law. *See Carver v. Sheriff of LaSalle County, Illinois*, 243 F.3d 379, 385 (7th Cir. 2001). Second, "[i]dentification of an 'employer' under Title VII *is* a question of federal law." *Id.* at 382. Finally, "the source of funds" needed to satisfy a Title VII judgment "need not coincide with the identity of the employer." *Id.* Consequently, regardless whether Macon County is Ms. Robinson's sole employer or joint employer, it still may be responsible for payment of an adverse judgment.

### D.  Claims Against Judge Shonkwiler

Judge Shonkwiler maintains that, even if the claims with respect to Judge Sappington and Macon County are reversed, he nevertheless is entitled to summary judgment because he was not personally involved in the harassment and because the claims against him simply mirror those against Judge Sappington. We agree.

Ms. Robinson has sued Judge Sappington only in his official capacity. As noted previously, and as Ms. Robinson's counsel conceded at oral argument, the purpose of naming both Judge Sappington and Judge Shonkwiler in their official capacities was to impose liability on their employer, the State of Illinois.

The facts that form the basis for the claims against both Judges are the same: the harassment by Judge Sappington that went unremedied by Janice Shonkwiler, Judge Greanias and Judge Shonkwiler. Ms. Robinson does not point to any facts that support independent claims of discrimination against Judge Shonkwiler; nor does she maintain that naming Judge Shonkwiler, in addition to Judge Sappington, imputes liability to any other governmental entity or provides her with additional sources that might satisfy a judgment. Consequently, because the claims against Judge Shonkwiler seek to impose liability against the same defendant—the State of Illinois—as do the claims against Judge Sappington, because the claims are based on the same facts and because they do not provide any additional resources for settlement or satisfaction of Ms. Robinson's claims, we believe that the claims against Judge Shonkwiler and Judge Sappington are redundant. *Cf. Jungels v. Pierce*, 825 F.2d 1127, 1129 (7th Cir. 1987) (holding that a claim brought against a mayor in his official capacity and against the city were brought against "one defendant . . . not two" and observing that "nothing was added by suing the mayor

in his official capacity"). We therefore affirm the judgment against Judge Shonkwiler in his official capacity on this basis. *See Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 262 (5th Cir. 1999) (holding that "a party may not maintain a suit against both an employer and its agent under Title VII").

## Conclusion

For the foregoing reasons, the judgment of the district court with respect to the claims against Judge Sappington, in his official capacity, and against Macon County is reversed, and those claims are remanded for further proceedings consistent with this opinion. The judgment of the district court with respect to the claims against Judge Shonkwiler is affirmed. Ms. Robinson may recover her costs in this court.

AFFIRMED IN PART; REVERSED and REMANDED IN PART.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*