In the

# United States Court of Appeals

### For the Seventh Circuit

No. 17-1469

LINDA REED,

*Plaintiff-Appellant,*

*v.*

COLUMBIA ST. MARY'S HOSPITAL,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 14-CV-330 — **J.P. Stadtmueller**, *Judge.*

ARGUED SEPTEMBER 12, 2018 — DECIDED FEBRUARY 8, 2019

Before EASTERBROOK, ROVNER, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* Plaintiff-appellant Linda Reed alleges that she suffered discrimination on the basis of her disabilities while she was a patient at defendant-appellee Columbia St. Mary's Hospital in March 2012. Among other things, she contends that the hospital failed to accommodate her disabilities by deliberately withholding from her a device she used to speak and discriminated against her by putting her in

a "seclusion" room to punish her. She brought claims under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181, which governs public accommodations offered by private entities, including hospitals, as well as Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and the Wisconsin Mental Health Act, Wis. Stat. § 51.61.

The district court granted the hospital's motion for summary judgment, dismissing the federal claims with prejudice and declining to exercise supplemental jurisdiction over the remaining state-law claims. *Reed v. Columbia St. Mary's Hospital*, 236 F. Supp. 3d 1091 (E.D. Wis. 2017). The court held that the hospital did not need to comply with Title III of the ADA because it fell within the Act's exemption for entities controlled by religious organizations. *Id.* at 1103–04, citing 42 U.S.C. § 12187. The court also dismissed Reed's Rehabilitation Act claims, finding that the hospital's alleged mistreatment of Reed was not premised *solely* on Reed's disability. *Id.* at 1105–08.

We reverse. The hospital raised its religious exemption affirmative defense to the ADA claims for the first time after discovery, in its motion for summary judgment. We explain below why we conclude it was an abuse of discretion to excuse the hospital's failure to raise this affirmative defense earlier. We also reverse the dismissal of Reed's Rehabilitation Act claims on the merits because they depend on disputed facts.

I.  *Factual & Procedural Background*

   A.  *Reed's Stay in the Hospital*

Our statement of facts reflects our standard of review for a grant of summary judgment. We cannot vouch for the objective truth of every detail. We review the facts and draw all

inferences from conflicting evidence in the light reasonably most favorable to Reed as the non-moving party. *Greengrass v. International Monetary Systems Ltd.*, 776 F.3d 481, 485 (7th Cir. 2015).

Reed suffers from several disabilities, including tardive dyskinesia ("TD"), bipolar disorder, and post-traumatic stress disorder. TD is a neurological disorder that causes involuntary facial and limb movements and makes speaking difficult. Reed has been prescribed a portable communication device called a Dynavox that she can use to generate speech.

Reed entered the hospital's emergency department on March 8, 2012. She reported suicidal thoughts. She was admitted to the inpatient behavioral health unit and left on March 12. Reed alleges that during her four-day stay at the hospital she was discriminated against in multiple ways. She claims that she was denied the use of her Dynavox; that hospital staff attempted to give her medication she was allergic to; that she was denied timely access to her medical records; that she was denied the use of a telephone to call her case manager (about whom the record reveals little); that she was denied access to a chaplain; and that she was physically escorted off the premises by two security guards. Notably, the hospital's corporate representative and nursing supervisor, William Fry, testified in his deposition that the Dynavox was locked up outside Reed's room at night and that she had access to it during the day only "as long as her behavior was appropriate."

The most severe of Reed's allegations is that on March 11, hospital staff refused to give her the Dynavox and took her to a seclusion room, where she was dropped on a mattress on the floor and later attempted suicide. Reed and the hospital give differing accounts of what exactly took place during this

incident. Reed claims that she asked for her Dynavox, that hospital staff refused to give it to her, that her TD-related movements caused her to spill coffee on herself and to fall to the ground, and that patient-care assistant Andrew Miller grabbed her and put her in the seclusion room for about two hours. Miller testified, on the other hand, that Reed was on the ground in a hallway crying and he told her she needed to get out of the hallway. When he was walking her back to her room, he claims, she began to scream and he and nursing supervisor Fry decided to take her to the seclusion room. On review of a grant of summary judgment for the defendant, of course, we must accept the plaintiff's version of events. Reed was discharged the day after this incident. According to Reed, her Dynavox and other possessions were thrown into a cab, and she was pushed into it by a security guard and sent off.

B.  *The District Court Proceedings*

Reed filed her first complaint *pro se* in February 2014. The district court dismissed that case without prejudice. The next month, Reed filed this new lawsuit, which the court construed as raising claims under the ADA and the Rehabilitation Act. The district court dismissed again, holding that the dismissal of the prior suit had preclusive effect and alternatively that Reed failed to state a claim. Reed appealed *pro se*. We vacated and remanded because the first case had been dismissed without prejudice and thus did not preclude the second. *Reed v. Columbia St. Mary's Hospital*, 782 F.3d 331, 335–36 (7th Cir. 2015). We also held that Reed stated viable claims under the ADA and the Rehabilitation Act. *Id.* at 337.

On remand, the district court recruited counsel for Reed. Her amended complaint asserted claims under the ADA for intentional discrimination, denial of reasonable modification,

and retaliation and intimidation; claims under the Rehabilitation Act for intentional discrimination and denial of reasonable accommodation; and patients'-rights claims under Wisconsin state law. The hospital filed answers to both the original complaint and the amended complaint. Each answer asserted several affirmative defenses. Neither answer mentioned a religious exemption from the ADA. Discovery was conducted from September 2015 to August 2016. In October 2016, the hospital moved for summary judgment, which the district court granted.

II. *Analysis*

This appeal presents one procedural issue and a cluster of substantive issues. The procedural issue is whether the district court abused its discretion in allowing the hospital to raise for the first time on summary judgment the affirmative defense of the ADA's Title III religious exemption. The substantive issues concern the merits of the Rehabilitation Act claims.

A. *The ADA Claims*

1. *The Religious Exemption Defense Under ADA Title III*

Title III of the ADA prohibits disability discrimination by "public accommodations," including hospitals. See 42 U.S.C. § 12181(7). Title III provides: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a). It is unlawful to "fail[] to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because

of the absence of auxiliary aids and services," unless the defendant can show that such accommodation "would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden." § 12182(b)(2)(A)(iii). A physical or mental impairment that "substantially limits one or more major life activities," including "speaking," qualifies as a disability under both the ADA and the Rehabilitation Act (discussed below). See 42 U.S.C. § 12102(1)(A), (2)(A); 29 U.S.C. § 705(20)(B); 34 C.F.R. § 104.3(j)(2)(ii); 45 C.F.R. § 84.3(j)(2)(ii).

Title III of the ADA applies generally to hospitals, but Title III exempts from its requirements "religious organizations" and "entities controlled by religious organizations, including places of worship." 42 U.S.C. § 12187. This exemption is an affirmative defense. A defendant invoking it must plead it in the answer. See Fed. R. Civ. P. 8(c); *Castro v. Chicago Housing Authority*, 360 F.3d 721, 735 (7th Cir. 2004). Rule 8(c) applies to "any avoidance or affirmative defense," and lists a number of particular defenses that must be pleaded. The religious exemption in Title III of the ADA is an affirmative defense because it assumes the plaintiff can prove everything she must to establish her claim but may still act to defeat her claim.[1]

It makes sense for the defendant claiming the Title III religious exemption to bear the burden of pleading and proving its religious control. We have said that a defense not listed in Rule 8(c) is an affirmative defense that must be pleaded if the

---

[1] "An affirmative defense is one that admits the allegations in the complaint, but avoids liability, in whole or in part, by new allegations of excuse, justification or other negating matters." *Divine v. Volunteers of America of Illinois*, 319 F. Supp. 3d 994, 1003 (N.D. Ill. 2018), quoting *Riemer v. Chase Bank USA, N.A.*, 274 F.R.D. 637, 639 (N.D. Ill. 2011).

defendant bears the burden of proof on the issue under state law or if the defense does not controvert the plaintiff's proof. *Winforge, Inc. v. Coachmen Industries, Inc.*, 691 F.3d 856, 872 (7th Cir. 2012). The religious exemption defense does not controvert the plaintiff's proof. It also draws on facts ordinarily within the knowledge and control of the defendant. See *Gomez v. Toledo*, 446 U.S. 635, 640–41 (1980) (qualified immunity is affirmative defense under 42 U.S.C. § 1983; relevant facts are peculiarly within knowledge and control of defendant); Wright & Miller, Federal Practice & Procedure § 1271. An ADA plaintiff should not need to spend the money to anticipate this defense without fair and timely notice that the defendant intends to rely upon it.

### 2. *Consequences of Failure to Plead a Defense*

A defendant's failure to plead an affirmative defense may result in a waiver of the defense if the defendant has relinquished it knowingly and intelligently, or forfeiture if the defendant merely failed to preserve the defense by pleading it. See *Wood v. Milyard*, 566 U.S. 463, 470 & n.4 (2012). Some of our opinions use the terms waiver and forfeiture interchangeably, but *Wood* shows that we need to pay attention to the difference. Whether courts apply waiver or forfeiture in response to a failure to plead, the purpose of the pleading requirement for an affirmative defense "is to avoid surprise and undue prejudice to the plaintiff by providing her notice and the opportunity to demonstrate why the defense should not prevail." *Venters v. City of Delphi*, 123 F.3d 956, 967 (7th Cir. 1997).

We have explained, however, that "the rule that forfeits an affirmative defense not pleaded in the answer (or by an earlier motion) is, we want to make clear, not to be applied rigidly."

*Garofalo v. Village of Hazel Crest*, 754 F.3d 428, 436 (7th Cir. 2014), citing *Matthews v. Wisconsin Energy Corp., Inc.*, 642 F.3d 565, 570 (7th Cir. 2011). We will generally find that the failure to plead an affirmative defense in the answer works a forfeiture "only if the plaintiff is harmed by the defendant's delay in asserting it." *Id.* There are limits, though, and in exercising their discretion in such matters, district courts must be alert to the real and practical harms that can result from failures to plead. We have explained that

> the district court has the discretion to allow an answer to be amended to assert an affirmative defense not raised at the outset. The pertinence of a particular defense may only become apparent after discovery, for example, in which case it would be reasonable for the court to permit the belated assertion of that defense. Nonetheless, the defendant remains obligated to act in timely fashion. Once the availability of an affirmative defense is reasonably apparent, the defendant must alert the parties and the court to his intent to pursue that defense. A defendant should not be permitted to "lie behind a log" and ambush a plaintiff with an unexpected defense. The appropriate thing for the defendant to do, of course, is to promptly seek the court's leave to amend his answer. His failure to do [so] risks a finding that he has waived the defense.

*Venters*, 123 F.3d at 967–68 (internal citations and quotation marks omitted).

Pleadings shape the litigation, including the scope and cost of discovery. Based on the claims and defenses raised in

the pleadings, the parties can discover information that is relevant, not privileged, and proportional to the needs of the case. See Fed. R. Civ. P. 26. Many efficiencies are lost when claims or defenses are left out of pleadings and a party then attempts to assert them at later stages. At the same time, it is not unusual for parties to discover new theories for claims or defenses in the course of discovery. Timely motions to amend pleadings for such newly discovered theories are appropriate under Federal Rule of Civil Procedure 15(a).

We see these problems more often when plaintiffs try to raise new theories or claims for the first time in opposing summary judgment. The concerns about unfair surprise and prejudice with unpleaded affirmative defenses are similar:

> When a new argument is made in summary judgment briefing, the correct first step is to consider whether it changes the complaint's factual theory, or just the legal theories [the] plaintiff has pursued so far. In the former situation, the plaintiff may be attempting in effect to amend its complaint, and the district court has discretion to deny the *de facto* amendment and to refuse to consider the new factual claims. In the latter, the court should consider the consequences of allowing the plaintiff's new theory. If it would, for example, cause unreasonable delay, or make it more costly or difficult to defend the suit, the district court can and should hold the plaintiff to his original theory.

*BRC Rubber & Plastics, Inc. v. Cont'l Carbon Co.*, 900 F.3d 529, 540 (7th Cir. 2018) (citations and internal quotation marks

omitted), quoting *Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852, 860 (7th Cir. 2017).

We routinely enforce this stricture against plaintiffs who wait until summary-judgment briefing to raise a new claim, despite the absence of an express pleading requirement, since complaints need not identify legal theories. See, e.g., *Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012) (*pro se* plaintiff); *Whitaker v. Milwaukee County*, 772 F.3d 802, 808 (7th Cir. 2014); *Trade Finance Partners, LLC v. AAR Corp.*, 573 F.3d 401, 412 (7th Cir. 2009); *Conner v. Illinois Dep't of Natural Resources*, 413 F.3d 675, 679–80 (7th Cir. 2005); *Griffin v. Potter*, 356 F.3d 824, 830 (7th Cir. 2004); *Grayson v. O'Neill*, 308 F.3d 808, 817 (7th Cir. 2002); *Whitaker v. T.J. Snow Co.*, 151 F.3d 661, 663–64 (7th Cir. 1998); *Auston v. Schubnell*, 116 F.3d 251, 255 (7th Cir. 1997); *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996); *Kostovetsky v. Ambit Energy Holdings, LLC*, 242 F. Supp. 3d 708, 718–19 (N.D. Ill. 2017) (reviewing Seventh Circuit case law). In much the same way, late assertions of affirmative defenses—like the religious exemption to Title III of the ADA—make litigation more costly and difficult and can make it unfairly difficult for a plaintiff to pursue her claims.

### 3. *The District Court's Ruling*

The district court held that the hospital did not waive or forfeit its religious exemption affirmative defense. The court acknowledged that the hospital raised the defense for the first time in its motion for summary judgment but explained that since this defense is not expressly listed in Federal Rule of Civil Procedure 8(c), "it is not clear that failure to assert it in the answer waives it." 236 F. Supp. 3d at 1101. That rationale will not hold water here. Precedent offers sufficiently clear guidance on when defenses not enumerated in Rule 8(c) must

be pleaded. See, e.g., *Gomez v. Toledo*, 446 U.S. 635, 640–41 (1980); *Winforge, Inc. v. Coachmen Industries, Inc.*, 691 F.3d 856, 872 (7th Cir. 2012); *Sundstrand Corp. v. Standard Kollsman Industries, Inc.*, 488 F.2d 807, 813 (7th Cir. 1973); *Brunswick Leasing Corp. v. Wisconsin Cent., Ltd.*, 136 F.3d 521, 530 (7th Cir. 1998). The statutory exemption here is based on facts in a defendant's control and clearly falls within the category of affirmative defenses.

The district court also held that Reed was not prejudiced by the hospital's delay in asserting this defense. For support, the court relied on an exchange during the deposition of nursing supervisor William Fry in February 2016, six months before the close of discovery, to find that Reed knew "for a substantial period that the religious exemption defense was a possibility." *Reed*, 236 F. Supp. 3d at 1101. We respectfully disagree. Here is the entire discussion from Fry's deposition:

> Q And so who – what is your understanding of the ownership of Columbia St. Mary's Hospital Milwaukee?
>
> MR. FOLEY: Object to form and foundation.
>
> THE WITNESS: I don't really know the answer to that. I don't really understand – I don't know the answer to that.
>
> BY MS. BARNES: Who owns the organization?
>
> MR. FOLEY: Object to form and foundation.
>
> THE WITNESS: I'll try to answer that. Ascension Healthcare is our parent sponsor of this ministry.

BY MS. BARNES: What does that mean, sponsor?

MR. FOLEY: Object to form.

THE WITNESS: Ascension Healthcare has multiple hospitals in multiple states across the country. That is, again, our – as far as I understand it, our parent ownership structure.

BY MS. BARNES: Okay. And is Ascension a religious organization?

A Yes.

Q What type of religious organization?

A It's a mission of the Roman Catholic Church.

Q A mission?

A Um-hum.

Q So is it – is it –

A A ministry, I should have said. I ministry of the Roman Catholic Church.

Q So is it – does it follow the principles of the Catholic church, when you say "ministry"?

MR. FOLEY: I'll object to form and foundation. I think this is far afield of –

THE WITNESS: Yeah, this is beyond my knowledge and expertise.

MR. FOLEY: – his knowledge. But if you can answer, go ahead.

> THE WITNESS: As far as I know, yes. I guess I don't really understand the question.
>
> BY MS. BARNES: What does it mean to be a ministry, I guess? I'm trying to understand it as well.
>
> A Well, we're a not for profit in the ministry of providing healthcare.

Fry Dep. at 13–15.

This brief exchange was with a witness who obviously did not understand the issue or identify the exemption, let alone try to assert the exemption. It is not comparable to a lawyer's statement that the party intends to assert a defense. The exchange did not put Reed on fair notice that the hospital would be asserting the religious exemption and that she needed to spend the time and money to conduct full-bore discovery on whether the hospital could satisfy the ADA's religious exemption.

The district court also thought that Reed knew when she filed suit that the hospital was at least nominally associated with the Catholic faith. Nominal association told plaintiff and tells us nothing about the availability of the religious exemption. The statutory test is "control." 42 U.S.C. § 12187. Countless entities have names that are associated with religions but are not subject to religious control.

Finally, the district court noted that Reed's response to the hospital's motion for summary judgment showed that she had studied the hospital's corporate structure and governing documents (or at least those submitted by the hospital). We

have a limited record before us on this issue.[2] The structure appears to be as follows: the hospital's sole corporate member is Columbia St. Mary's Inc. In turn, Columbia St. Mary's Inc. is "sponsored by" its two corporate members: Ascension Health (a Catholic national health system) and Columbia Health System, Inc. (a non-sectarian community health system). Ascension Health is a subsidiary of Ascension Health Alliance, which is a subsidiary of Ascension Health Ministries. The Congregation of Consecrated Life and Societies of Apostolic Life of the Vatican conferred public juridic personality on Ascension Health Ministries in June 2011. Ascension Health Ministries' governing documents state that it shall be governed in accordance with canon law. Thus, the hospital is subject to two lines of control: (1) a Catholic one (Ascension Health Ministries —> Ascension Health Alliance —> Ascension Health —> Columbia St. Mary's Inc. —> the hospital); and (2) a non-sectarian one (Columbia Health System —> Columbia St. Mary's Inc. —> the hospital).

The hospital's bylaws reflect these two lines of control: they say that the hospital "shall be and remain a Catholic facility or institution" but also that the hospital will "respect the nonsectarian traditions and values of Columbia Health System." Similarly reflecting these two lines of control but reversing the emphasis, the bylaws of Columbia St. Mary's Inc. (the hospital's sole corporate member) say that it "shall not be a Catholic facility or institution" but that it will not perform

---

[2] The record is limited since this defense was sprung on Reed in the motion for summary judgment. Most of the relevant evidence comes from the documents the hospital chose to submit. Even those documents show a complicated corporate legal structure and an ambiguous relationship with the hospital's Catholic affiliates.

medical procedures inconsistent with Catholic ethical directives. Columbia St. Mary's Inc.'s bylaws reserve certain powers to both Ascension Health and Columbia Health System.[3] Columbia St. Mary's Inc.'s officers and board members "serve ex officio" as the hospital's officers and board members. Important for the issue of control, the board members are recommended by Columbia St. Mary's Inc.'s existing board for appointment by Ascension Health and are intended to "be broadly representative of the communities served." Relying on this corporate structure as disclosed by the hospital in its summary judgment materials, the district court determined that the hospital was sufficiently controlled by the Catholic Church as to fall within Title III's religious exemption and to make it immune to Reed's ADA claims.

### 4. *Abuse of Discretion*

We express no opinion on whether, after full discovery and fair litigation of the issue on a more complete record, the hospital might fit within the exemption for entities controlled by religious organizations. Instead, we find that the district court abused its discretion by considering this affirmative defense at all.

Several factors point in this direction. First, the defendant hospital has offered no excuse or explanation for failing to plead the defense in it answers or for raising the defense so late. Without a credible excuse for the delay, the hospital's late invocation of the defense looks like a straight ambush of the plaintiff when it was too late for her to put together a

---

[3] We are told that these dual lines of control are also detailed in the terms of an Affiliation Agreement, but that document has not been produced to Reed or included in the record.

comprehensive rebuttal. Second, the religious-exemption defense should not ordinarily depend on discovery from the plaintiff, as will often be the case with other affirmative defenses such as statutes of limitations, estoppels, waivers, and others. Instead, the religious-exemption defense will ordinarily depend on facts within the knowledge and control of the defendant itself. Third, the defendant did not deploy this defense until after discovery had closed, meaning both parties had already invested a good deal of time and money in the case on the legitimate expectation that they knew what the issues were. Allowing a last-minute defense that introduces such new factual and legal issues after discovery has closed raises the costs of litigation and allows the party that was at least negligent in failing to plead its defense to take unfair advantage of its opposing party. Fourth, the district court's rationale for allowing the defense to be raised so late simply does not withstand scrutiny. In this case, a few facts relevant to this potential affirmative defense came up briefly in one deposition. As we explained above, that cannot be reasonably treated as fair notice that the hospital would actually assert the defense and that the plaintiff would need to spend the time and money needed to meet that defense. The plaintiff was entitled to rely on Rule 8(c) and the hospital's silence in its pleadings.

The situation here is similar to that in *Venters v. City of Delphi*, where we concluded that the defendants waived their statute of limitations affirmative defense. 123 F.3d 956, 967–69 (7th Cir. 1997). There, the defendants failed to include the defense in their answers to the original and amended complaints. We could "discern no justification for the delay" when they asserted the defense for the first time in their reply memorandum in support of their motion for summary judgment.

*Id.* at 968. While a difference here is that Reed was at least given notice of the defense in the motion for summary judgment itself and could attempt to respond, she was still at a serious disadvantage. That notice came after the parties had completed discovery. As in *Venters*, we "cannot overlook the failure to comply with Rule 8(c) in this context. Intentionally or not, [plaintiff] was bushwacked." *Id.* at 969. Put simply, "it was not [plaintiff's] obligation to raise the defense, and if Rule 8(c) is not to become a nullity, we must not countenance attempts to invoke such defenses at the eleventh hour, without excuse and without adequate notice to the plaintiff." *Id.*[4]

Finally, the prejudice to Reed from the delayed assertion of the defense is especially acute here because the relevant law and facts simply are not clear. The ADA does not define what it means to be considered a "religious organization" or to be "controlled by a religious organization." See 42 U.S.C. § 12187. To our knowledge, no federal appellate court has yet construed this religious exemption. Several district courts have—including the veteran judge who decided this case. See *Rose v. Cahee*, 727 F. Supp. 2d 728, 747 (E.D. Wis. 2010).[5]

---

[4] In contrast, we held that a district court did not abuse its discretion in *Robinson v. Sappington* when it allowed the defendants to amend their pleadings at summary judgment to add affirmative defenses. 351 F.3d 317, 332–33 (7th Cir. 2003). There, the record showed that the plaintiff had sufficient notice that the defendants might pursue the defenses because defense counsel had explored them in detail during discovery. *Id.* Further, the plaintiff did not suggest she was prejudiced in any way by the late amendment. *Id.*

[5] In *Rose*, the court applied the religious exemption where a Roman Catholic institute sponsored a healthcare corporation and occupied a primary role in the corporation's corporate governance structure, the institute members made up the entirety of one class of corporate membership,

These district court decisions show that the issue can be complex, both factually and legally. These decisions have cited and relied on the following Department of Justice interpretation of the religious exemption:

> The ADA's exemption of religious organizations and religious entities controlled by religious organizations is very broad, encompassing a wide variety of situations. Religious organizations and entities controlled by religious organizations have no obligations under the ADA. Even when a religious organization carries out activities that would otherwise make it a public accommodation, the religious organization is exempt from ADA coverage. Thus, if a church itself operates a day care center, a

and the institute's class members had the sole authority to amend or repeal the corporation's articles of incorporation and bylaws. 727 F. Supp. 2d at 747. As for the other district court cases applying the exemption, Reed correctly points out that in none was the defense raised late, and in all there was greater evidence of religious control. See *Cole v. Saint Francis Medical Ctr.*, No. 1:15-CV-98(ACL), 2016 WL 7474988, at *4-6 (E.D. Mo. Dec. 29, 2016) (exemption was "properly raised by Defendant as an affirmative defense" and hospital was "under the jurisdiction of the Bishop of the Roman Catholic Dioceses[.]"); *Marshall v. Sisters of the Holy Family of Nazareth*, 399 F. Supp. 2d 597, 606 (E.D. Pa. 2005) (school "solely operated and controlled by" order of nuns); *White v. Denver Seminary*, 157 F. Supp. 2d 1171, 1173–74 (D. Colo. 2001) (seminary was founded by Baptist association and employees were required to be active Christians). By contrast, in *Sloan v. Community Christian Day School, LLC*, a Christian school was found to not be exempt since the school was not owned, affiliated with, or financially supported by any recognized religious group and was instead owned by two individuals who were not ministers. No. 3–15–0551, 2015 WL 10437824, at * 3, (M.D. Tenn. Dec. 11, 2015).

nursing home, a private school, or a diocesan school system, the operations of the center, home, school, or schools would not be subject to the requirements of the ADA or this part. The religious entity would not lose its exemption merely because the services provided were open to the general public. The test is whether the church or other religious organization operates the public accommodation, not which individuals receive the public accommodation's services.

Religious entities that are controlled by religious organizations are also exempt from the ADA's requirements. Many religious organizations in the United States use lay boards and other secular or corporate mechanisms to operate schools and an array of social services. The use of a lay board or other mechanism does not itself remove the ADA's religious exemption. Thus, a parochial school, having religious doctrine in its curriculum and sponsored by a religious order, could be exempt either as a religious organization or as an entity controlled by a religious organization, even if it has a lay board. *The test remains a factual one – whether the church or other religious organization controls the operations of the school or of the service or whether the school or service is itself a religious organization.*

28 C.F.R. ch. 1., pt. 36, App'x C (emphasis added).

For this appeal, the critical points are that the law governing the hospital's affirmative defense is still highly contestable

and its application may well depend on a host of facts that would need to be explored in some depth. Before summary judgment briefing, plaintiff Reed had no notice that she needed to prepare to meet the defense.

We have considered the possibility of a response less drastic than treating the hospital's religious-exemption defense as forfeited. One possibility would be to allow the parties to pursue further discovery on that issue and to have the hospital pay for plaintiff's reasonable costs and attorney fees for that process. In this case, however, the hospital has offered no credible excuse for its delay, and the normal rule is forfeiture of unpleaded defenses. The remedy of reopening discovery would also impose additional delay on Reed. We see no mitigating factors here that would favor anything other than enforcement of Rule 8(c) as written and treating the defense as forfeited. We therefore reverse summary judgment for the hospital on the ADA claims.

B. *Rehabilitation Act Claims*

1. *Legal Standard*

We now turn to the merits of Reed's Rehabilitation Act claims. Section 504 of the Rehabilitation Act provides: "No otherwise qualified individual with a disability … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]" 29 U.S.C. § 794(a). Four elements must be satisfied to establish a violation of Section 504: (1) the plaintiff must be a handicapped individual as defined by the Act; (2) the plaintiff must be "otherwise qualified" for participation in the program; (3) the program must receive federal

financial assistance; and (4) the plaintiff must have been "denied the benefits of the program solely because of his handicap." See *Mallet v. Wisconsin Div. of Vocational Rehabilitation*, 130 F.3d 1245, 1257 (7th Cir. 1997). The hospital contests only this fourth element of sole cause. The ADA and the Rehabilitation Act are otherwise very similar, but the Rehabilitation Act prohibits discrimination only if it is "solely by reason of" a person's disability. The ADA permits mixed-motive claims. See *Whitaker v. Wisconsin Dep't of Health Servs.*, 849 F.3d 681, 684 (7th Cir. 2017).

A plaintiff suing under the Rehabilitation Act can assert that she was intentionally discriminated against or that the defendant failed to afford her a reasonable accommodation for her disability. The Rehabilitation Act does not contain an explicit accommodation requirement, but the Supreme Court has located a duty to accommodate in the statute generally. We have written that in *Alexander v. Choate*, 469 U.S. 287 (1985),

> the Court explained that "'a refusal to modify an existing program might become unreasonable and discriminatory.'" *Id.* at 300 (quoting *Southeastern Cmty. Coll. v. Davis*, 442 U.S. 397, 413 (1979)). The Rehabilitation Act's promise of "meaningful access" to state benefits, according to the Court, means that "reasonable accommodations in the grantee's program or benefit may have to be made." *Id.* at 301.

*Wisconsin Community Services, Inc. v. City of Milwaukee*, 465 F.3d 737, 747 (7th Cir. 2006). We explained further:

Following *Choate*, several courts of appeals have
adopted the view that the Rehabilitation Act re-
quires public entities to modify federally as-
sisted programs if such a modification is neces-
sary to ensure that the disabled have equal ac-
cess to the benefits of that program. *See, e.g.*,
*Henrietta D. v. Bloomberg*, 331 F.3d 261, 274–75
(2d Cir. 2003). These circuits, including ours,
also follow the corollary principle implicit in the
*Choate* decision that the Rehabilitation Act helps
disabled individuals obtain access to benefits
only when they would have difficulty obtaining
those benefits "by reason of" their disabilities,
and not because of some quality that they share
generally with the public.

*Id.* at 748.

### 2. *Analysis of the Rehabilitation Act Claims*

We review *de novo* the district court's grant of summary
judgment on the merits. *Whitaker*, 849 F.3d at 684. Summary
judgment is proper when the moving party shows that there
is no genuine dispute as to any material fact and that it is en-
titled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

We reverse the dismissal of Reed's intentional discrimina-
tion claim, which is based only on the seclusion-room inci-
dent. The district court determined that the undisputed facts
show that the "seclusion incident" was motivated at least in
part by factors other than Reed's disability. The court stated
that Reed "admits that she spilled her coffee and thereafter
fell to the floor screaming. She further concedes that Miller

told her that she could not remain on the floor in the middle of the hallway. (Docket # 55 ¶ 43)." *Reed*, 236 F. Supp. at 1106.

The district court either misconstrued or exaggerated Reed's concessions. Reed has not conceded any of the reasons Miller cited for taking her to the seclusion room. The district court did not include a record citation for its assertion that Reed admitted she fell to the floor "screaming." We have not seen such an admission in the record. Reed admits that she spilled coffee and was on the floor of the hallway. She specifically denies she was screaming. See Dkt. 55, ¶¶ 38–45, citing Reed Affidavit, Ex. A, Dkt. 55-26. According to the district court, this disturbance at least partially motivated the hospital staff to put her in seclusion.

The undisputed facts show that Reed spilled coffee on herself and was on the floor of the hallway. We agree with the district court that Miller was responding to this situation (and not solely to Reed's disabilities) when he picked her up off the floor. So far, so good. But Miller himself testified that, at that point, he started to take Reed back to her own room (not the seclusion room). It was only during the walk to her room that, because of her screaming, the decision was made to take her to the seclusion room. Thus, a jury could find that nothing Reed has conceded (spilling coffee and lying on the floor) led Miller to take her to the seclusion room. Spilling the coffee and lying on the floor prompted Miller only to take Reed back to her own room. It was the action that Reed specifically denies (screaming during the walk) that Miller says led him and Fry to take Reed to the seclusion room. Reed has not conceded that she did anything disruptive during the walk to her room, when hospital staff decided to take her to the seclusion room. The material facts that led to her being placed in seclusion are

disputed. Crediting Reed's version of the event, a reasonable jury could find that the hospital intentionally discriminated against Reed solely on the basis of her disability.[6]

We also reverse the dismissal of Reed's reasonable accommodation claim. This claim is based on all of the allegations Reed asserts in her complaint (seclusion-room incident; withholding Dynavox; security escort off the premises; and denial of requests to use telephone, to see a chaplain, and to see medical records). While medical professionals certainly are entitled to discretion in managing their patients, the hospital has not argued that it withheld the Dynavox in the exercise of professional judgment to treat Reed's mental illness. Withholding the Dynavox in particular may support a viable failure-to-

---

[6] The parties have not addressed another issue that may arise on remand. The Rehabilitation Act and the Americans with Disabilities Act do not create a remedy for medical malpractice. See *Grzan v. Charter Hosp.*, 104 F.3d 116, 122–23 (7th Cir. 1997), abrogated on other grounds as stated in *Amundson v. Wisc. Dep't of Health Svcs.*, 721 F.3d 871, 874 (7th Cir. 2013); *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996) (prisoner's claim); accord, e.g., *McGugan v. Aldana-Bernier*, 752 F.3d 224, 231–32 (2d Cir. 2014); *Burger v. Bloomberg*, 418 F.3d 882, 883 (8th Cir. 2005); *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1289, 1294 (11th Cir. 2005); *Fitzgerald v. Corrections Corp. of America*, 403 F.3d 1134, 1144 (10th Cir. 2005). As the Second Circuit explained in *McGugan*, the term "discrimination" can have a benign (and perfectly lawful) sense, in which a health care provider makes a discriminating professional judgment about the type of treatment to provide to a patient, but can also have a pejorative sense that describes actions taken based on irrelevant criteria under the influence of irrational bias. See 752 F.3d at 231–32, comparing *United States v. University Hosp.*, 729 F.2d 144, 156 (2d Cir. 1984), and *Green v. City of New York*, 465 F.3d 65, 78 (2d Cir. 2006). In this appeal, the hospital has not argued that it withheld Reed's Dynavox from her as a benign form of discrimination, i.e., as an exercise of medical judgment for her appropriate treatment.

accommodate claim under the Rehabilitation Act, subject to the considerations discussed above in note 6.

The district court's grant of summary judgment in favor of the hospital is REVERSED and the case is REMANDED for proceedings consistent with this opinion. On remand, Circuit Rule 36 shall apply.