# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

February 25, 2026

Lyle W. Cayce
Clerk

———————

No. 24-50956

———————

Melissa Hickson, *Individually and as the Independent Administrator of* the estate of Michael Hickson, *deceased* and *as next friend of* M.H, M.H. and M.H. (all *minors*); Marques Hickson,

*Plaintiffs—Appellants*,

*versus*

St. David's Healthcare Partnership, L.P., L.L.P.; Dr. Devry Anderson; Hospital Internists of Texas; Carlye Mabry Cantu; Viet Vo,

*Defendants—Appellees*.

———————————————————

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:21-CV-514

———————————————————

Before King, Jones, and Wilson, *Circuit Judges*.

Edith Hollan Jones, *Circuit Judge*:

In June 2020, St. David's Healthcare Partnership, L.P., LLP d/b/a St. David's South Austin Medical Center ("St. David's Healthcare") stopped giving food and fluids to Michael Hickson, a loving husband and father of five who was hospitalized for illnesses that he had previously overcome. The doctors told Michael's wife that his inability to walk or talk meant he had a low quality of life. Michael passed away. His surviving family sued St.

No. 24-50956

David's Healthcare and several doctors for disability discrimination, violation of 42 U.S.C. § 1983, and on various state-law theories. The district court dismissed or granted summary judgment on all claims. We AFFIRM in part and VACATE and REMAND in part. In particular, the federal claims based on the allegations that he was denied medical treatment solely because of his disability may go forward, along with the state claims relating to informed consent and intentional infliction of emotional distress.

## I. Background

According to plaintiffs' allegations, Michael Hickson became severely disabled in May 2017 when he suddenly went into cardiac arrest and suffered anoxic brain injury. First responders arrived on the scene to help resuscitate him. But their aggressive resuscitation efforts injured Michael's spinal cord. Ultimately, he experienced quadriplegia, motor weakness, vision loss, slow speech, short-term memory loss, difficulty swallowing, and difficulties with bowel and bladder management. From that time, Michael required assistance to eat, dress, groom, bathe, toilet, and transfer to and from his wheelchair.

Michael was still active in other ways. He could laugh at jokes, do math with his children, respond "yes" or "no" to questions by nodding or shaking his head, speak with his wife and children (in a limited, slow, and muted manner), and sing and pray with family.

Given Michael's condition, his wife Melissa sought in court to become his permanent guardian and refiled the application after the family moved from Dallas to Austin. But one of Michael's sisters contested Melissa's guardianship application. Before reaching a final decision, the probate court appointed Family Eldercare, Inc. ("Family Eldercare") as Michael's temporary guardian. Family Eldercare assigned employee Ashley

No. 24-50956

Nicole Yates as Michael's temporary guardian until April 1, 2020, when Jessica Drake, a trainee-subordinate, assumed those duties.

Meanwhile, Michael's spinal-cord injury left him susceptible to infections. He was thus hospitalized several times but recovered from recurring urinary tract infections, sepsis, and pneumonia.

The fatal hospitalization occurred in June 2020, when Michael was again admitted to St. David's Healthcare for pneumonia, urinary tract infection, sepsis, and suspected COVID-19. When Michael arrived in the emergency department, St. David's Healthcare used a Modified Early Warning Score to assess risk of mortality and the corresponding level of care that Michael needed. The assessment showed that Michael had a 70% chance of survival.

Despite this chance of survival and Michael's recovery three months earlier after a similar hospitalization, Dr. Steven Jennings suggested to Dr. Carlye Cantu that Michael should be placed on hospice and his code status should indicate do-not-resuscitate ("DNR"). Dr. Cantu acquiesced and developed a care plan that included comfort measures and assistance from palliative-care personnel. Dr. Cantu informed the palliative-care team that comfort care would be a "kind" choice because of Michael's poor quality of life.

Over the next few days, Michael's health fluctuated. He responded quickly to antibiotics but intermittently required oxygen. He experienced lung aspirations that required the hospital to stop feeding him, as well as a high fever.

Michael's health eventually began to stabilize, however. Jessica from Family Eldercare emailed Melisa that her husband's health was stable and vital signs were improving. His feeding tubes were restarted. His renal function normalized. He only required minimum oxygen at times. And he

was able to visit with his wife and children via FaceTime. Michael was "very responsive, smiling[,] and reacting to their conversation."

But after the visit, a nurse told Melissa that Michael was being transferred to inpatient hospice. Melissa then spoke to Dr. Vo, her husband's doctor. Dr. Vo explained that Michael had been moved to hospice and placed on DNR. When Melissa pressed Dr. Vo and the hospital on why they would not treat her husband, Dr. Vo responded that her husband "[did not] have much" of a quality of a life because of his paralysis and brain injury. Dr. Vo also opined that Michael's quality of life was "different" from other patients who were receiving aggressive treatment because other patients were walking and talking. Michael's doctors thus stopped the antibiotics, transferred him to hospice, renewed the DNR order, and ordered the withdrawal of all life-sustaining treatment. Even though Michael's treatment had been working and his chance of survival was still 70%, his doctors ordered cessation of food and fluids.

Miraculously, three days later, Michael's condition improved. The hospital's ethics consultant, a palliative-care nurse, and Dr. Cantu questioned whether inpatient hospice care was still appropriate. But life-sustaining treatments were never restarted. Instead, a hospice nurse reduced Michael's feeding tube to "a low trickle rate" to prevent stomach pain, while still denying fluids.

During this time, Melissa tried to visit her husband. Visitors apparently were not allowed, so at most, Melissa could only experience a FaceTime visit. With no success, Melissa repeatedly called the hospital over the following days to arrange a FaceTime with her husband. Instead, St. David's Healthcare kept telling her that Michael was "comfortable." Eventually, she was advised to call Family Eldercare for more information.

No. 24-50956

Melissa thus tried multiple times to contact Jessica, the temporary guardian, and eventually received an email from Alice, Jessica's supervisor, stating that Michael had improved and may have to have his hospice care reevaluated. But Family Eldercare responded that Melissa needed to call the hospital to set up visits. Still struggling to get answers from either the hospital or Family Eldercare, Melissa eventually spoke with an individual from hospice care who told her that her husband had passed away, and his body was being sent to a funeral home.

Seventeen days later, Melissa posted a video on Facebook where she complained about Michael's care at St. David's Healthcare and the failings of Family Eldercare. In response, the Chief Medical Officer for St. David's Healthcare, Dr. Anderson, posted a statement on the hospital's website. Dr. Anderson disclosed a significant amount of Michael's protected health information to support his contention that the hospital did not unlawfully withhold treatment because Michael allegedly experienced multi-system organ failure. He slurred Melissa by reporting that the family court declined to appoint her as her husband's temporary guardian and that it was uncommon for guardianship to be taken away from a family member. Dr. Anderson further stated that Melissa was allowed visitation only when "security was present," and he had "legal authority" from Family Eldercare as the temporary guardian to disclose Michael's protected health information.

Melissa and the family sued St. David's Healthcare, Dr. Anderson, Dr. Cantu, the Hospital Internists of Texas (the organization directly employing Dr. Cantu), and Dr. Vo.[1] They asserted ten claims covering four categories: disability discrimination under § 504 of the Rehabilitation Act of

---

[1] Plaintiffs also sued and settled with Family Eldercare and Jessica Drake.

No. 24-50956

1973 and § 1557 of the Patient Protection and Affordable Care Act ("ACA") against St. David's Healthcare; various state law medical negligence, informed consent, and wrongful death claims against the hospital and Drs. Vo and Cantu; § 1983 violations; and intentional infliction of emotional distress against the hospital and Dr. Anderson.

Defendants moved to dismiss the Hicksons' complaint. The magistrate judge recommended that the district court dismiss the disability discrimination claims; § 1983 claims; claims against Dr. Vo and Dr. Cantu; and Melissa's intentional infliction of emotional distress ("IIED") claim. The plaintiffs timely objected only to the magistrate judge's recommendation on the disability discrimination and § 1983 claims.

The district court overruled the objections and dismissed with prejudice all the claims recommended by the magistrate judge for dismissal. Certain negligence, negligence per se, and wrongful-death claims remained. Later, the district court granted summary judgment to the defendants on those remaining state law claims. The Hicksons appealed.

## II. Standard of Review

This court reviews the district court's order granting a Fed. R. Civ. P. 12(b)(6) motion to dismiss de novo, "'accepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiffs.'" *Teeuwissen v. Hinds County*, 78 F.4th 166, 170 (5th Cir. 2023) (quoting *Meador v. Apple, Inc.*, 911 F.3d 260, 264 (5th Cir. 2018)). The court does not "presume true a number of categories of statements, including legal conclusions; mere labels; threadbare recitals of the elements of a cause of action; conclusory statements; and naked assertions devoid of further factual enhancement." *Harmon v. City of Arlington*, 16 F.4th 1159, 1162–63 (5th Cir. 2021) (internal quotation omitted). A complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on

No. 24-50956

its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949 (2009). The district court's decision to dismiss with prejudice is reviewed for abuse of discretion. *Dobbin Plantersville Water Supply Corp. v. Lake*, 108 F.4th 320, 325 (5th Cir. 2024) (citing *Club Retro, LLC v. Hilton*, 568 F.3d 181, 215 n.34 (5th Cir. 2009)).

### III. Discussion

The Hicksons challenge the dismissal of several claims. They assert that, contrary to the district court, disability laws do not categorically preclude disability-discrimination claims related to medical-treatment decisions; the defendants acted under color of state law for purposes of § 1983 liability; their informed consent and failure to guide claims against Dr. Vo and Dr. Cantu should not have been dismissed; and Melissa asserted a cognizable IIED claim against St. David's Healthcare. Each is discussed below.[2]

### A. Disability Discrimination

The Hicksons contend that St. David's Healthcare discriminated against Michael by reason of his disability because the reason St. David's Healthcare stopped treating him was his inability to walk or talk. Put more specifically, they raise the question whether an adverse medical treatment decision can be the basis of a disability discrimination claim.

---

[2] As to other claims originally raised and rejected by the district court, the plaintiffs have failed to brief and accordingly have forfeited any arguments on appeal pertaining to those. *See* Fed. R. App. P. 28(a)(8) (an appellant's brief must contain "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies"); *Boone v. Rankin Cnty. Pub. Sch. Dist.*, 140 F.4th 697, 711 (5th Cir. 2025) ("[F]ailure to raise an issue on appeal constitutes waiver of that argument.") (internal quotation omitted).

We agree that the district court erred in holding categorically that no disability discrimination can arise from the medical treatment of disabled persons. Although one previous decision observed that disability discrimination laws do not "*typically* provide a remedy for negligent medical treatment," *Carter ex rel. Carter v. City of Shreveport*, 144 F.4th 809, 815 (5th Cir. 2025) (emphasis added), that does not mean that the failure to treat a patient can *never* constitute disability discrimination. Under § 504 of the Rehabilitation Act[3] and § 1557 of the ACA,[4] a plaintiff establishes a prima facie case by proving that "(1) he has a qualifying disability; (2) he is being excluded from participation in, denied the benefits of, or otherwise discriminated against by a covered entity; and (3) such discrimination is by reason of his disability." *Francois v. Our Lady of the Lake Hosp., Inc.*, 8 F.4th 370, 378 (5th Cir. 2021) (internal citation omitted). Importantly, "the plaintiff must establish that disability discrimination was the *sole* reason for the exclusion or denial of benefits." *Cummings v. Premier Rehab Keller, P.L.L.C.*, 948 F.3d 673, 676 (5th Cir. 2020) (emphasis added) (internal quotation omitted), *aff'd*, 596 U.S. 212, 142 S.Ct. 1562 (2022). In the statute, "[t]he word *solely* provides the key: the discrimination must result from the handicap and from the handicap alone." *Johnson ex rel. Johnson v. Thompson*, 971 F.2d 1487, 1493 (10th Cir. 1992) (emphasis in original).

---

[3] Section 504 prohibits "any program or activity receiving Federal financial assistance" from discriminating against an otherwise qualified individual "*solely* by reason of her or his disability." 29 U.S.C. § 794(a) (emphasis added).

[4] Section 1557 prohibits discrimination based on any of the grounds protected under the Rehabilitation Act (among others), 42 U.S.C. § 18116(a), thereby incorporating the Rehabilitation Act's substantive analytical framework for any disability-discrimination claims. *Francois v. Our Lady of the Lake Hosp., Inc.*, 8 F.4th 370, 378 (5th Cir. 2021) (citing *Doe v. BlueCross BlueShield of Tenn., Inc.*, 926 F.3d 235, 239 (6th Cir. 2019)).

Several other circuits recognize that a plaintiff may state a disability discrimination claim for a denial (or provision) of medical treatment by alleging that "the defendants made treatment decisions based on factors that are 'unrelated to, and thus improper to consideration of' the inquiry in question." *McGugan v. Aldana-Bernier*, 752 F.3d 224, 234 (2d Cir. 2014) (quoting *United States v. Univ. Hosp., State Univ. of N.Y. at Stony Brook*, 729 F.2d 144, 156 (2d Cir. 1984))); *see also Lesley v. Hee Man Chie*, 250 F.3d 47, 57 (1st Cir. 2001) (an inference of discrimination may be warranted "[o]nly where the physician's judgment is entirely without any reasonable medical basis"). As the Seventh Circuit explained, "the term 'discrimination' can have a benign (and perfectly lawful) sense, in which a health care provider makes a discriminating professional judgment about the type of treatment to provide to a patient, but [it] can also have a pejorative sense that describes actions taken based on irrelevant criteria under the influence of irrational bias." *Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 486 n.6 (7th Cir. 2019) (citing *McGugan*, 752 F.3d at 231–32); *see also McDaniel v. Syed*, 115 F.4th 805, 825–26 (7th Cir. 2024) (concluding that a prison's decision to house the plaintiff in a unit without stairs was more than inadequate medical care and not a real medical treatment decision as the prison contended).

Consistent with the statutes and these decisions, we hold that a plaintiff asserts a cognizable claim for disability discrimination based on adverse medical treatment decisions—or decisions not to treat—when allegations show that the treatment was based "solely," in the pejorative sense, on the individual's disability. 29 U.S.C. § 794(a). A contrary categorical holding that medical treatment decisions can never qualify as disability discrimination could shield improper conduct, such as refusing to prescribe flu medication to a blind person only because of his blindness or refusing to set a person's broken arm only because she is diabetic. Accordingly, we do not accept statements by other circuits that medical

treatment decisions, or the withholding of medical care, never qualify as disability discrimination.[5]  Any categorical bar to disability discrimination liability in this context contravenes the statutory text and common sense. The district court erred in holding otherwise.

### B. Section 1983

The Hicksons contend that the district court was mistaken when it found that the hospital and Drs. Vo and Cantu were not state actors for purposes of asserting some kind of liability based on 42 U.S.C. § 1983.  These defendants, they assert, "act[ed] in concert" with Michael's temporary legal guardian, who qualifies as a state actor, and the defendants "stepped into the State's traditional and exclusive role" as *parens patriae* when they ignored the family's request to take Michael off of DNR status and stopped provided life-sustaining treatment.  These assertions are ill founded.

First, appointed guardians are *not* state actors.  Under Texas law, a court may only appoint a temporary guardian if it "is necessary to protect the proposed ward or the proposed ward's estate."  Tex. Est. Code § 1251.051.  Guardians therefore do not represent the State of Texas.  They represent individuals. Jessica's role as a court-appointed guardian for Michael resembles that of a public defender in that she does not represent

---

[5] *See, e.g.*, *Dinkins v. Corr. Med. Servs.*, 743 F.3d 633, 634 (8th Cir. 2014) (per curiam) (affirming dismissal because "claims were based on medical treatment decisions—including not properly diagnosing and treating Dinkins's pernicious anemia—which cannot form the basis of a claim under the RA or the ADA"); *Burger v. Bloomberg*, 418 F.3d 882, 883 (8th Cir. 2005) (per curiam) ("[A] lawsuit under the Rehab Act or the Americans with Disabilities Act (ADA) cannot be based on medical treatment decisions."); *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1289, 1294 (11th Cir. 2005) ("The Rehabilitation Act, like the ADA, was *never* intended to apply to decisions involving the termination of life support or medical treatment." (emphasis added)).

the state, but only the individual patient or client. *See Polk Cnty. v. Dodson*, 454 U.S. 312, 318–22, 102 S.Ct. 445, 449–52 (1981).

Along with most circuits, Fifth Circuit caselaw suggests that guardians are not state actors. *See Crank v. Crank*, 146 F.3d 868 (5th Cir. 1998) (per curiam) ("Even if the district court had permitted Crank to amend her complaint to add the children's guardian *ad litem* as a party, Crank would still lack a state actor defendant."(internal citation omitted)).[6]  The plaintiffs' reliance on *Thomas S. v. Morrow*, 781 F.2d 367 (4th Cir. 1986), is misplaced.  In that case, the guardian worked with the state hospital and local agency officials, *id.* at 377–78, whereas Jessica worked with a private hospital and doctors.

In no way are Dr. Vo or Dr. Cantu state actors. *See Bass v. Parkwood Hosp.*, 180 F.3d 234, 242–43 (5th Cir. 1999) (noting that "a private hospital is not transformed into a state actor merely by statutory regulation" and that "a private citizen or hospital does not become a state actor by participating" in a civil commitment).  This fact is fatal to any § 1983 claim, which specifically "protects against acts attributable to a State, not those of a private person," and "tracks" the Fourteenth Amendment's requirement that *States* follow constitutional limits. *Lindke v. Freed*, 601 U.S. 187, 194, 144 S.Ct. 756, 764–65 (2024); *see also Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 929, 102 S.Ct. 2744, 2749 (1982) ("[T]he statutory requirement of action

---

[6] *See, e.g.*, *Milan v. Wertheimer*, 808 F.3d 961, 964 (2d Cir. 2015) ("[W]e hold that law guardians who act as 'attorney[s] for the child' are not state actors for the purposes of suits filed pursuant to § 1983."); *Kirtley v. Rainey*, 326 F.3d 1088, 1096 (9th Cir. 2003) ("[T]he function of the guardian . . . does not satisfy the state action test."); *Long v. Pend Oreille Cnty. Sheriff's Dep't*, 385 F. App'x 641, 642 (9th Cir. 2010) (mem. op.) ("The district court properly granted summary judgment as to the guardian ad litem and her assistant because, as a matter of law, they are not state actors."); *Meeker v. Kercher*, 782 F.2d 153, 154–55 (10th Cir. 1986) ("[A] guardian ad litem is not acting under color of state law for purposes of § 1983.").

No. 24-50956

'under color of state law' and the 'state action' requirement of the Fourteenth Amendment are identical.").

Finally, citing *T.L. v. Cook Children's Med. Ctr.*, 607 S.W.3d 9 (Tex. App.—Fort Worth 2020, pet. denied), the Hicksons assert that defendants "stepped into the State's traditional and exclusive role," "act[ed] as *parens patriae*[,] and regulat[ed] the means of [Michael]'s death." But *T.L.* recognized that private healthcare providers are not state actors, and they only become state actors when "a medical treatment decision made for a minor child [is] *contrary to the desires of the child's parents* [and] is the sovereign prerogative of the state as *parens patriae*." 607 S.W.3d at 41 (emphasis in original). Here, Family Eldercare was Michael's temporary guardian. The Hicksons do not allege that St. David's Healthcare, Dr. Cantu, or Dr. Vo withdrew medical treatment against the wishes of Jessica or Family Eldercare. *T.L.* is wholly inapposite.

### C. Informed Consent

Because the Hicksons failed to object to the magistrate judge's recommendation for their informed consent claim, plain-error review applies. *See Ortiz v. City of San Antonio Fire Dep't*, 806 F.3d 822, 825 (5th Cir. 2015). On appeal, therefore, the Hicksons "must show (1) an error that has not been affirmatively waived, (2) that is clear or obvious, and (3) that affects [their] substantial rights." *United States v. Huerta*, 770 F. App'x 169, 170 (5th Cir. 2019) (per curiam) (citing *Puckett v. United States*, 556 U.S. 129, 135, 129 S.Ct. 1423, 1429 (2009)). "Plain error is a 'stringent and difficult' standard." *Id.* (internal quotation omitted).[7]

---

[7] The "failure to guide" claim, which pertains to the doctors' alleged inadequate information to Jessica, is forfeited for failure to brief the issue adequately on appeal. *See* Fed. R. App. P. 28(a)(8); *JTB Oil Tools & Oilfield Servs., LLC v. United States*, 831 F.3d 597, 601 (5th Cir. 2016) (concluding that claims were "inadequately briefed and therefore

No. 24-50956

The informed consent claim fails to assert sufficient facts to establish a claim. Under Texas law, a physician or health care provider generally has a duty "to disclose the risks or hazards that could have influenced a reasonable person in making a decision to give or withhold consent." TEX. CIV. PRAC. & REM. CODE § 74.101. In the complaint, the Hicksons allege that Dr. Vo's notes on the Treatment Decision Form were "appallingly scant and grossly inadequate." But they fail to specify how Dr. Vo's notes were "grossly inadequate" or what Dr. Vo should have included in his medical notes. They only allege that Dr. Vo was "working at the direction of, under the supervision of, or in cooperation with Defendant Dr. Cantu" when communicating with Michael's temporary guardian. They make no pertinent allegations against Dr. Cantu.

Without further details, the court cannot determine whether some nondisclosure "could have influenced a reasonable person in making a decision to give or withhold consent." TEX. CIV. PRAC. & REM. CODE § 74.101. On appeal, the Hicksons argue that Dr. Vo and Dr. Cantu were required to inform Michael's temporary guardian that he had a 70% chance of survival with appropriate treatment before denying lifesaving treatment, food and fluids. Appellants' arguments, however, do not cure inadequate allegations in the Rule 12(b)(6) context. *Ferrer v. Chevron Corp.*, 484 F.3d 776, 782 (5th Cir. 2007); *see also Sw. Bell Tel., L.P. v. City of Houston*, 529 F.3d 257, 263 (5th Cir. 2008) ("[W]hen deciding, under Rule 12(b)(6), whether to dismiss for failure to state a claim, the court considers, of course, *only* the allegations in the complaint." (emphasis added)). The Hicksons' informed-consent claim was therefore deficient.

---

waived" when the brief included only "conclusory assertions," "fail[ed] to offer any support argument or citation to authority," and failed to "identify relevant legal standards" or Fifth Circuit caselaw).

No. 24-50956

More narrowly, however, the district court plainly erred when it dismissed this claim *with* prejudice rather than *without* prejudice. Dismissing an action with prejudice is generally appropriate when "it is clear that the defects are incurable or [when] the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal." *Great Plains Tr. Co. v. Morgan Stanley*, 313 F.3d 305, 329 (5th Cir. 2002).

Here, neither the magistrate judge nor the district court afforded the Hicksons an opportunity to cure the factual deficiencies concerning informed consent. Because the deficiencies are factual and possibly curable, an amendment may not be futile. Dismissal with prejudice constituted plain error.

### D. Intentional Infliction of Emotional Distress

Even when we apply plain error review,[8] the district court should not have dismissed Melissa's IIED claim against the hospital.[9]

Under Texas law, a plaintiff must establish four elements to recover damages for intentional infliction of emotional distress: "(1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe." *Hoffmann-La Roche Inc. v. Zeltwanger*, 144 S.W.3d 438, 445 (Tex. 2004) (citing *Standard Fruit & Vegetable Co. v. Johnson*, 985 S.W.2d 62, 65 (Tex. 1998)). The district court's decision relied only on the second element: extreme and outrageous conduct. This element requires conduct to be " 'so outrageous in character,

---

[8] The Hicksons failed to object to the magistrate judge's recommendation for this claim. Thus, plain-error review applies. *See Ortiz*, 806 F.3d at 825.

[9] The plaintiffs have not appealed the district court's dismissal of Melissa's IIED claim against Dr. Anderson.

and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Id.* (quoting *Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex. 1993)).

Melissa's allegations, if borne out, suggest that St. David's Healthcare engaged in extreme and outrageous conduct. A few days into Michael's hospitalization, Melissa learned that St. David's Healthcare placed Michael on DNR status and stopped giving him food, fluids, or medications other than for pain. Melissa "pleaded" with Dr. Cantu to change Michael's code status, but Dr. Cantu said that only Jessica could do so. And when Michael's condition unexpectedly improved and caused the hospital's ethics consultant, a palliative-care nurse, and Dr. Cantu to question whether inpatient hospice care was still appropriate, the hospital never restarted hydration or nutrition for Michael, leaving him to starve and thirst to death.

Moreover, Melissa was prevented from visiting her husband in person or speaking to him over FaceTime in his last few days of life. Instead, St. David's Healthcare escorted her from the hospital with uniformed security officers, positioned uniformed security officers by her side when she did visit, denied many requests to speak with her husband, disclosed Michael's protected health information in its public statement,[10] and insinuated her unfitness to serve as her husband's guardian. The hospital neglected to inform her of Michael's death and, when pressed to this admission, callously announced that his body was on the way to a funeral home.

---

[10] It is difficult to conceive how the guardian could "permit" Dr. Anderson to release such private information, given that Michael's passing meant that the whole reason for the guardianship had ceased to exist.

These allegations are more than just "troublesome"; they are atrocious. The impact on Melissa of the hospital's starving her husband to death, refusing to give him fluids, preventing her from talking to Michael as he was dying, failing to inform the family immediately of his passing, and posting the public statement against her go far "beyond all possible bounds of decency" and are "utterly intolerable in a civilized community." *Hoffmann-La Roche Inc.*, 144 S.W.3d at 445. Texas courts have found similar conduct to be extreme and outrageous. *See, e.g.*, *Elliott v. Methodist Hosp.*, 54 S.W.3d 789, 796–97 (Tex. App.—Houston [1st Dist.] 2001, pet. denied) (finding extreme and outrageous conduct when a hospital refused to provide a patient and her mother certain medical records for eighteen months, causing the patient to suffer pain, distress, and depression from "not having closure" and "not finding out whether the initial [diagnosis] was correct or not"); *Escalante v. Koerner*, 28 S.W.3d 641, 647 (Tex. App.—Corpus Christi 2000, pet. denied) (determining that, after a couple repeatedly asked the doctor about the bodily remains of a twin child that passed away in the womb, a doctor engaged in extreme and outrageous conduct when the doctor lied to the couple, told them that this twin child was "reabsorbed," and instead disposed of the twin's remains as surgical waste rather than allowing the couple to afford the child a proper burial).

Taken together, Melissa's IIED allegations were sufficient to state a claim. The district court plainly erred by dismissing Melissa's IIED claim with prejudice.

## IV. Conclusion

For these reasons, the district court's judgment is AFFIRMED in part, and its judgment on the disability discrimination claims and the informed consent and IIED claims is VACATED and REMANDED in part for further proceedings consistent herewith.